CARAWAY, J.
 

 h Johnathan Tramaine Givens was charged by bill of information with second degree murder and was convicted of the lesser responsive verdict of manslaughter after a jury trial. Givens received a sentence of 37 years at hard labor, with credit for time served, and now appeals his conviction and sentence. We affirm.
 

 Facts
 

 On the morning of July 20, 2006, Givens had the custody and supervision of 22-
 
 *593
 
 month-old Kartravious McBride at the home of the child’s mother, Zwannica McBride. McBride, Givens and the baby spent the night of July 19, 2006, at the home alone. The following morning McBride left the baby in the care of Givens sometime after 8:00 a.m. According to Givens, after McBride left, he went back to sleep in the bed the couple shared with the child who was also asleep. Givens testified that he later awoke around 10:50 a.m. to the sound of the landlord knocking on the door. He talked with the landlord for a few minutes and went back into the bedroom when he noticed that Kartravious’s underwear was wet and soiled. Givens cleaned the child and placed him on the training toilet. He then went back into the bedroom where he dozed for 10-15 minutes. When Givens got up he went into the bathroom and allegedly found Kartravious in or near a cabinet under the sink where household cleaners were kept. Givens admitted to spanking the baby with a belt four or five times. He claimed that he scooped the child up in one arm and spanked him with his belt in the other hand.
 

 | gAfterwards, Givens got the child ready to go to Givens’ mother’s house approximately a quarter of a mile away. Givens testified that as he and the baby were going out of the door, he went back inside for his keys. As he retrieved them, Givens alleged that the baby got out of the door and fell down the outside steps. The steps were a concrete set of four steps with the highest step measuring two feet from the ground. Givens did not believe that the fall hurt the child until he heard him wheezing as he carried him back into the house. Givens testified that he assumed the wind had been knocked out of the baby so he laid Kartravious on a bed to allow him to catch his breath. Givens realized that something was wrong with the child when he continued to wheeze and was lethargic. He carried the baby to his mother’s house where he called 911. Prior to the time that an ambulance arrived, Givens and his two sisters, Ebony and Dominique, attempted CPR. Upon arrival sometime after 11:00 a.m., the Shreveport firefighters and EMTs unsuccessfully performed CPR on Kartravious, who was pronounced dead upon his hospital arrival shortly after noon.
 

 When the police interviewed Givens on July 20, 2006, he admitted he spanked the baby with a belt that morning when he found him in the bathroom cabinet. He claimed that the baby may have gotten into poison while in the cabinet. The defendant also told the police the baby had fallen off the porch steps but he did not know what caused the baby’s death.
 

 The autopsy report revealed that the baby had massive internal injuries and the coroner ruled the death a result of “battered child syndrome.” Givens was again interviewed on July 25, 2006, and | -¡subsequently arrested and charged with second degree murder by an amended bill of indictment on February 19, 2009.
 

 A jury convicted Givens of manslaughter and he was sentenced to 37 years at hard labor with credit for time served. After the denial of motions for new trial, post verdict judgment of acquittal and reconsideration of sentence, this appeal ensued.
 

 Discussion
 

 I.
 

 Givens argues that there is no evidence proving that he was the perpetrator of any violence against the child and that the state failed to prove that the baby did not succumb to the continued neglect of his mother and other suspect caregivers. Givens also argues that the physical appearance of the child was inconsistent with the coroner’s reported cause of death; it
 
 *594
 
 also could have been caused by the CPR administered to the child.
 

 When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under
 
 Hudson v. Louisiana,
 
 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. |
 
 ¿State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Bosley,
 
 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La.10/17/97), 701 So.2d 1333.
 

 The
 
 Jackson
 
 standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 05-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La. App.2d Cir.1/14/09), 1 So.3d 833,
 
 writ denied,
 
 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685;
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 unit denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 

 The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La.App.2d Cir|V13/08),6 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La. App.2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 06-1083 (La.11/9/06), 941 So.2d 35.
 

 An appellate court reviewing the sufficiency of the evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. WTien the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Jacobs,
 
 504 So.2d 817 (La.1987);
 
 State v. Adkins,
 
 39,724 (La. App.2d Cir.6/29/05), 907 So.2d 232,
 
 unit denied,
 
 06-2514 (La.5/4/07), 956 So.2d 607.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. Wdien the conviction is based on circumstantial evidence, such evidence must exclude any reasonable hypothesis of innocence. La. R.S. 15:438. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 State v. Calloway,
 
 07-2306 (La.1/21/09), 1 So.3d 417. AVhen a case involves circumstantial evidence, and the jury reasonably
 
 *595
 
 rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.
 
 State v. Captville,
 
 448 So.2d 676, 680 (La.1984). When a jury reasonably and rationally rejects the exculpatory hypothesis of | ¿innocence offered by a defendant’s own testimony, an appellate court’s task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 Calloivay, supra.
 
 Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury.
 
 State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986).
 

 The state charged Givens with second degree murder as set forth in La. R.S. 14:30.1(A)(2)(b) as follows:
 

 A. Second degree murder is the killing of a human being:
 

 (2) When the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles, second degree cruelty to juveniles ... even though he has no specific intent to kill or to inflict great bodily harm.
 

 In pertinent part, the crime of cruelty to juveniles includes the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. La. R.S. 14:93. Second degree cruelty to juveniles, the greater offense, is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child. Serious bodily injury means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily 17member, organ or mental faculty or substantial risk of death. La. R.S. 14:93.2.3.
 

 The jury convicted Givens of the crime of manslaughter, found in La. R.S. 14:31, which reads:
 

 A. Manslaughter is:
 

 (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
 

 (2) A homicide committed, without any intent to cause death or great bodily harm.
 

 (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person.
 

 There was a significant amount of testimony presented by both the state and the defense describing the appalling neglect and mistreatment of this child in the months leading up to his death. The next door neighbors to McBride, Fannie Reli-ford and Roy D. Lewis, were described as conducting drug activities in their house which lacked electricity and water. Yet, the child was often left by McBride in their care. Reliford testified that she noticed that the baby had burn spots, would
 
 *596
 
 hold his stomach in a strange way and flinch if you told him not to do something. Reliford stated that she and Lewis babysat Kartravious the night of July 19, 2006, until McBride picked him up at about 12:00 a.m. She recalled that at that time the baby appeared fíne.
 

 |sThe critical testimony of the state’s case was the testimony of the forensic pathologist, Dr. Frank Peretti, who performed the autopsy. Dr. Peretti’s testimony, which was the only medical testimony concerning the death, narrowed the causation for the fatal injuries to trauma received in a short period of time immediately before death.
 

 Dr. Peretti testified that there was ample evidence of both old and new injury to the body. Upon external examination, the doctor found multiple diffuse injuries to the child. Old injuries included cigarette burns to the right and left hands, and an oval scar on the back of his head which was consistent with a cigarette burn. He had a semi-lunar scar on the right side of his neck and a left distal tibial spiral fracture. The child had multiple recently-healing rib fractures which were trauma-induced and a two-day old fracture of a rib. The physician noted patterned, prominent contusions or bruises on his buttocks, presumably from being struck with a belt. The doctor noted that “you could see the actual pattern of the belt on the child’s buttocks.” He made incisions at this site which revealed “deep hemorrhage” in the buttocks.
 

 Upon internal examination of the child, Dr. Peretti “became very concerned, because blood just started pouring out of his abdomen.” He measured a cup of blood in the child’s abdomen excluding that which ran off onto the table. Upon removal of the chest plate, he found the child’s lungs had collapsed and collected two cups of blood on the right side of the chest cavity and one cup of blood on the left. Dr. Peretti observed that the |9hilum (the blood vessels going into the chest) was torn, meaning that the circulatory system was opened.
 

 Upon his inspection of the child’s abdomen, Dr. Peretti noticed a considerable amount of abdominal trauma. He noted two small contusions on the front of the child’s abdomen. He found that the back right lobe of the child’s liver was lacerated. The mid portion of the pancreas was lacerated and bruised, the area connecting the intestines was torn, and the intestines were bruised. The tissue surrounding the kidney was lacerated and torn, as well as two muscles in the child’s pelvis. The physician found contusions in the scrotal sac involving the right testicle.
 

 Dr. Peretti next examined the child’s head. He found abrasions on both sides of Kartravious’s face. He found five separate impact sites on his scalp, although there were no skull fractures. He attributed those impacts to slapping. Dr. Peretti found no hemorrhage surrounding the brain, but saw “massive cerebral edema, meaning the brain was just swollen.”
 

 The doctor testified that a child with these injuries would be in a great deal of pain, would not act normally or even be able to walk. When asked how long the child could survive with these types of injuries the doctor responded,
 

 You know, it depends. Probably a few minutes; it could be an hour or so. Just depends how — you know, maybe a little longer. Depending how he’s bleeding inside. He would become — you know, as he keeps on losing blood, he’ll become like listless, you know, be unresponsive; probably have this blank stare in his face because he’s losing blood. You know, he’s getting weak. That’s what’s happening.
 

 
 *597
 
 |10The doctor also described that the child would probably be wheezing. Dr. Peretti said the child most certainly would not have survived the night, ruling out that the injuries had happened the night before. Dr. Peretti testified that the facial abrasions aligned with falling off steps. However, he testified that the overall injuries were not consistent with falling off stairs, “[bjecause usually when children fall — I mean, kids fall off their bicycles and swing sets, you know all the time. They don’t sustain these type of injuries. Otherwise, we’d have many dead children.”
 

 The doctor testified that after the exam he determined that the severe blunt trauma exhibited on the body, to the chest and abdomen, caused the baby’s death and that he had bled to death internally. Essentially, the baby had been forcibly squeezed or punched to death, injuries that could not be caused by a belt. When the child is squeezed or punched, pressure from the abdomen goes up into the chest, through the heart. With the force, blood vessels rupture. Dr. Peretti explained that with this type of injury, there would not necessarily be external injury. The two small bruises on the child’s abdomen were consistent with someone having their hands or thumbs pressed into the child. Dr. Peretti did not believe the injuries were caused by CPR given the child.
 

 Dr. Peretti testified that poisoning deaths are rare. He stated that he did not see powder on the child or notice abnormal odor which would indicate poisoning. He looked for irritation in various areas of the body but found none. He found that the mucosal surfaces were normal and there was no burning of the tongue. He found no aspiratory material in the nose or Inmouth. He observed the trachea area, which was smooth. He looked at the esophagus which was normal. Dr. Peretti testified that no boric acid was found in the baby’s blood sample and that there were neither external nor internal signs of poisoning.
 

 Dr. Peretti concluded that the cause of death, evidenced by the multitude of old and fresh injuries to the child including blunt force chest and abdominal injuries, was battered child syndrome. The immediate cause of death would have been hemorrhaging and hypervolemic shock. Photographs of the various injuries were identified by Dr. Peretti and placed into evidence.
 

 On cross-examination, the doctor rejected the defense’s concern that poisoning could not be ruled out because the toxicology screens performed on the baby only tested for boric acid and a litany of pharmaceuticals, but no other household chemicals. Dr. Peretti unequivocally stated that the child was not poisoned. Dr. Peretti also testified that the compressions from CPR should not tear a diaphragm which is “a really tough muscle.” He concluded that the child’s injuries were not consistent with improperly administered CPR, but rather consistent with putting hands around the midsection of a child and squeezing. The injuries to the back of the liver were inconsistent with CPR injury. Further, the doctor stated that a working circulatory system is required in order to receive the internal injuries and lacerations exhibited, and therefore incorrect CPR would not cause the excessive hemorrhaging because CPR is performed when the circulatory system is not functioning. The doctor concluded:
 

 |12And then does this explain — this faulty CPR causing the injuries like this, does this explain why that child stopped breathing in the first place? He stopped breathing not because of CPR. There’s another reason why he stopped breathing. It’s because he’s got hyper-volemic shock. He’s bleeding internally.
 
 *598
 
 He has all that blood in his chest; his lungs are collapsed; and he has blood in the abdomen.
 

 Dr. Peretti also testified that all the injuries were incurred at the same time.
 

 Bruce LePoint, a Shreveport firefighter and EMT, responded to the July 20, 2006 emergency call and found a girl incorrectly performing CPR on Kartravious by blowing air into him. He testified that the child was not breathing and never regained consciousness. LePoint also testified that a man came up to him at the scene and volunteered that the baby had taken some poison two days before and fell. LePoint said he asked the man two more times what happened and although the man’s description of events did not change, the time in which the events allegedly happened did. LePoint testified that a child’s internal organs could be seriously damaged if someone were to perform CPR incorrectly by applying compressions to the stomach rather than the chest.
 

 Firefighter Michael Scott Johnson testified that he had to remove Kartravious from the bed to the floor before starting chest compressions, because compressions done on a bed would be pointless. Johnson reported that the baby had a bruise on his chest, before he administered CPR, no pulse and was not breathing. Johnson saw no sign of poisoning. Givens told him that the child had fallen off the porch two days ago and that on that morning he found him under the kitchen cabinet eating rat poison for which he spanked Kartravious.
 

 | iSThe defendant’s sisters, Dominique and Ebony Givens, both testified at trial. Dominique testified that Givens brought the child to the family home on July 20 and asked her to watch him while he went to work. Nevertheless, soon after his arrival, the baby stopped breathing and she and Givens frantically tried to locate a phone to call 911. Dominique and Ebony Givens both described a chaotic scene where all three attempted to give the baby CPR on a bed. Ebony stated she was trained in CPR and when she entered the room and saw the others performing CPR incorrectly she took over. Ebony also stated that at one point Dominique was shaking and squeezing the baby trying to get him to wake up. Dominique admits pressing on the child’s stomach and using her hands to press on his diaphragm because neither she nor Givens knew how to properly give CPR. Dominique testified that the baby had stopped breathing about 10 minutes before the ambulance arrived and before CPR was attempted. Ebony testified that the baby had a faint pulse and that she heard him wheezing at some point.
 

 The baby’s mother, McBride, testified that she never saw Givens hit her baby, although she had been told that he had. She said the baby started getting more bruises when he began walking. McBride testified that on the night of July 19, 2006, she picked the baby up from Reliford’s house no later than 11:00 p.m. She testified that when the baby saw her he started crying for her, and Reliford gave him a “pop” and told him to stop. McBride corroborates Givens’ version of the events occurring in the late evening and early morning | ,4of July 20, 2006. She testified that the morning of July 20, she went to the doctor to find out if she was pregnant, left the house at about 9:00 a.m. and that nothing appeared to be wrong with the baby.
 

 The defense presented testimony regarding Kartravious’s caregivers. Latoya Clark testified she once accompanied McBride to pick up the baby at Roy D. Lewis’s house and that the baby was in the front yard by himself. When Lewis appeared he seemed drunk.
 

 
 *599
 
 The defendant’s mother, Mary Henderson, testified that all three of Givens’ children spent time in her home with the defendant, and that he never mistreated the children. She further testified that the defendant would steal food from her house to feed Kartravious and McBride.
 

 Former child protection investigator, Tammie Evans, testified she performed a Safety Assessment for Kartravious McBride in March 2006, after he received a spiral fracture, and did not find just cause to remove the child from the home.
 

 Givens took the stand in his defense and testified consistently with earlier statements he had given to police. He stated that he woke McBride up to get her off to an early appointment and first dealt with the baby around 10:50 a.m. He testified that he cleaned the soiled child and placed him on the training potty and went back to the bedroom where he dozed off for 10 to 15 minutes. When he awoke he found the baby in the cabinet under the sink where household cleaners were kept. Givens admitted to spanking the baby four or five times to teach him not to go under the cabinet. Givens denied squeezing the baby. Afterwards, Givens claimed that Kartravious | isfell down the stairs outside of McBride’s house. He rushed to his mother’s house where his sisters assisted him in giving the child CPR until emergency personnel arrived.
 

 Finally, in rebuttal by the state, Dr. Todd Thoma, Caddo Parish Coroner, testified that after reviewing the autopsy he found there was no sign of poisoning.
 

 The evidence undisputedly showed that Givens had the sole custody of the child who was not shown to be in pain or discomfort before his mother left the home. By Givens’ own admissions, the child went into serious distress even before Givens left McBride’s house. Givens identified the child’s fall or possible poisoning as the events which first harmed the child. He described the symptoms of wheezing and lethargy as having commenced in McBride’s house. Dr. Peretti’s testimony identified the wheezing and lethargy as the symptoms that would be associated with the extreme blunt trauma which killed the child. Dr. Peretti’s testimony overwhelmingly ruled out a fall or poisoning as the cause of death. Further, Dr. Peretti found no support for the defense theory that the baby died from CPR-related injuries. He explained that to produce the type of bleeding exhibited on Kartravious, a working circulatory system is needed. Givens and his sisters testified that the child had stopped breathing when CPR began. He also testified that the injuries to the rear of the child’s liver were inconsistent with the theory that improper CPR caused the child’s injuries. Dr. Peretti’s eyewitness observation and detailed medical examination of 11(ithe child’s body were obviously reasonably credited by the jury and accepted as true.
 

 From the totality of the evidence before it, the jury could have reasonably concluded beyond a reasonable doubt, to the exclusion of every other hypothesis of innocence, that it was Givens who, during the morning hours of July 20, 2006, inflicted great bodily harm upon the child by punching or squeezing the child causing mortal injuries. The jury’s choice to impose the lesser included offense of manslaughter is fully supported by the evidence. On these grounds, we find no merit to Givens’ complaints.
 

 II.
 

 In his second assignment of error, Givens argues that inadmissible La. C.E. art. 404(B) “other crimes evidence” was introduced at trial regarding previous instances of abuse to the baby including a March 2006 spiral fracture to the child’s tibia and
 
 *600
 
 a May 2006 report of child abuse made by Charlotte Marshall, the child’s paternal grandmother. Givens argues that the evidence was unfairly prejudicial because jurors naturally presumed the acts were perpetrated by him without clear and convincing proof.
 

 A trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion.
 
 State v. Scales,
 
 93-2003 (La.5/22/95), 655 So.2d 1326,
 
 cert. denied,
 
 516 U.S. 1050,116 S.Ct. 716, 133 L.Ed.2d 670 (1996);
 
 State v. Caston,
 
 43,565 (La.App.2d Cir.9/24/08), 996 So.2d 480;
 
 State v. Cooks,
 
 36,613 (La. App.2d Cir.12/4/02), 833 So.2d 1034.
 

 | 17For evidence of other crimes to be admissible, the state must: 1) prove with clear and convincing evidence that the other acts or crimes occurred and were committed by the defendant; 2) demonstrate that the other acts satisfy one of the requirements of La. C.E. art. 404(B)(1), i.e., motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident; and 3) show that the probative value of the evidence outweighs its prejudicial effect.
 
 State v. Jackson,
 
 625 So.2d 146 (La.1993).
 

 The erroneous introduction of other crimes evidence is subject to harmless error review.
 
 State v. Roberson,
 
 40,809 (La. App.2d Cir.4/19/06), 929 So.2d 789;
 
 State v. Gatti,
 
 39,833 (La.App.2d Cir.10/13/05), 914 So.2d 74,
 
 writ denied,
 
 05-2394 (La.4/17/06), 926 So.2d 511;
 
 State v. Salter,
 
 31,633 (La.App.2d Cir.2/24/99), 733 So.2d 58,
 
 writ denied,
 
 99-0990 (La.9/24/99), 747 So.2d 1114.
 

 The trial court heard testimony from five witnesses during a pretrial 404(B) hearing on the admissibility of evidence relating to the baby’s spiral fracture received in March 2006 and a May 2006 report of abuse which included photographs of the baby’s injuries. Evidence of those events was deemed admissible and ultimately introduced at trial, over defense objection.
 

 Christina Pettiway, McBride’s cousin, testified at trial that she sometimes babysat Kartravious. Christina testified that though he was not a bad child she would sometimes have to spank him. She said that in March 2006 she saw Givens spank the child with a belt because the baby was | isspitting up and throwing his food. Christina testified that she thought he was spanking the baby on the behind. She stated she found the spanking a little harsh and that the defendant seemed aggravated. She testified she did not notice a limp until later, when the baby limped into the room where she was. On cross-examination, she admitted she did not think the defendant had hit the child hard enough to hurt him physically, and again that she thought he had hit him on the behind and did not see him hit his leg or ankle. She also testified that the defendant was not angry when disciplining the baby, just aggravated.
 

 Crystal Pettiway, another cousin of McBride, testified the baby sometimes appeared afraid of Givens and would not want the defendant around him, or would start crying. She never saw the defendant discipline the child.
 

 Dr. Tonya Clayton, an emergency room physician at LSU Health Sciences Center, examined the child on March 25, 2006, when he was brought in for a leg injury. She testified that Kartravious was 16 months old at the time. The child’s mother told Dr. Clayton she did not know the cause of the injury but that her child had been in the care of a 19-year-old cousin when it happened. Dr. Clayton testified that the only other marks she noticed on the child were a bruise on both the baby’s knee and ankle. She determined that the
 
 *601
 
 baby had an oblique spiral fracture, a fracture extremely common in children of Kar-travious’s age because they are so active and just learning to walk. She also testi-fled that it was not probable that the fracture was caused by abuse, and that she did not suspect abuse after examining the | ijibaby. She called child protective services only because that is a routine response when a child’s caregivers do not know how a child is injured. She stated that though it may be possible to hit a child with a belt and not leave a mark, this type of fracture is not caused by a belt. On cross-examination, Dr. Clayton stated that this injury, often called a “toddler’s fracture,” is not usually associated with abuse.
 

 Trial testimony also included evidence gathered in response to a 911 call made by Charlotte Marshall, the baby’s paternal grandmother, in May 2006. Captain Michael Taylor testified that he responded to Charlotte Marshall’s house and that she told him only that she wanted the baby’s injuries noted. Officer Kimberly Broom Henderson testified that she also responded to the 911 call and upon arriving at Marshall’s home, was told by Marshall that the injuries were inflicted by “possibly her daughter or daughter’s boyfriend” whose name she did not know. Marshall never indicated that she saw Givens abuse the child or why she suspected him.
 

 Marshall also testified that she suspected Givens of abuse because the child’s injuries began appearing after McBride began dating him, although she had only seen him alone with the child four times. Marshall also stated that she had never seen Givens mistreat the child and admitted her dislike of him.
 

 We find merit to Givens’ argument that the trial court erred in allowing evidence of the baby’s March 2006 tibial spiral fracture and Marshall’s May 2006 report of abuse to be introduced at trial, Generally, the clear and convincing burden of proof requires more than a (^“preponderance of the evidence” but less than “beyond a reasonable doubt.” The existence of the disputed fact must be highly probable, that is, much more probable than its non-existence.
 
 State v. Johnson,
 
 458 So.2d 987 (La.App. 1st Cir.1984),
 
 writ denied,
 
 463 So.2d 593 (La.1985). The evidence presented by the state provides no clear and convincing proof that the acts in question were caused by Givens or were even the result of abuse. In fact, Dr. Clayton testified that, in her medical opinion, the March 2006 spiral fracture was not abuse related. Pettiway was the only person who admitted seeing the defendant discipline the baby in March. She, however also testified that she did not believe the punishment would have caused the child injury and that the only reason she believed Givens had caused the spiral fracture was because she did not know how else it would have happened.
 

 Likewise, Marshall’s opinion to police regarding Givens being the perpetrator of the May 2006 injuries was inadequate to satisfy the high evidentiary burden. While abuse of the child was evident, the only connection of Givens to the injuries was based upon Marshall’s assumption that was insufficient to qualify as clear and convincing proof.
 

 On these grounds, we find error in the trial court’s admission of these events into evidence. Even so, the erroneous introduction of other crimes evidence is subject to a harmless error review. With evidence that Givens was alone with the child in the hours preceding his death and the testimony of Dr. Peretti that the injuries were necessarily inflicted no more than an hour before death, any prior history of abuse was unnecessary for proof of 121 Givens’ guilt. Moreover, the
 
 *602
 
 lack of evidence connecting Givens to the prior incidents was arguably favorable to his defense that other parties had inflicted injuries to the child. On these grounds, we find no merit to this assignment of error.
 

 III.
 

 Givens next argues that the trial court erred when it denied a request for mistrial after the testimony of Givens’ ex-girlfriend detailing police reports she made relating to domestic disputes between herself and Givens. Givens argues that the evidence was an impermissible reference to other arrests and crimes.
 

 After the state rested its case, the trial court held a hearing on a motion in limine filed by the state requesting that the court limit any evidence of Givens’ character to general reputation evidence. At the hearing, the defense asked to be permitted to present evidence of the defendant’s character more specific than his general reputation in the community. The court granted the motion in part by ruling the parties must adhere to La. C.E. art. 405(B), which bars specific instances of conduct unless character or a trait is an essential element of the charge. However, the trial court also denied the state’s motion in part, stating that the defense would be allowed some latitude in presenting specific instances of conduct.
 

 At trial, Veronica Willis, the mother of the defendant’s child, Damien Givens, testified for the defense that the defendant took good care of her child, and that she never had any cause to complain. She stated that Damien loved his father very much and they often played together. On cross-|examination,22 the state asked Willis if she recalled calling the police on July 8, 2002, and telling them the defendant had dragged her by the throat and rammed her head into a wall. She said she did not remember. The state then asked her if she recalled telling the police on September 25, 2004, that the defendant had come to her house and kicked out a window. Willis said she did remember that, but she did not recall if her child was in the house at the time. The state then asked if on September 26, 2004, the defendant threatened that he was going to break Willis’s jaw and kick her in the face. She again answered that she could not recall.
 

 After questioning of the witness was completed, the defense requested a mistrial based on the introduction by the state of other crimes evidence. No contemporaneous objection was made by the defense during Willis’s testimony. The court held the motion in abeyance pending further research and allowed the trial to proceed. The court eventually denied the motion for mistrial but agreed to issue an admonishment including instructions on impeachment by inconsistent statements and rebuttal character evidence.
 

 La.C.Cr.P. art. 770(2) provides that a mistrial shall be granted upon motion of the defendant when a remark or comment is made within the hearing of the jury by the judge, district attorney, or a court official during trial or in argument and that remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
 
 State v. Ellis,
 
 42,520 (La. App.2d Cir.09/26/07), 966 So.2d 139,
 
 writ denied,
 
 07-2190 (La.4/4/08), 978 So.2d 325.
 

 12rjLa. C.E. art. 607(C) provides that to attack the credibility of a witness, a party may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony. Further, evidence of a pri- or inconsistent statement may only be admitted when offered solely to attack the credibility of the witness and does not
 
 *603
 
 constitute substantive evidence of guilt if the probative value of the evidence on the issue of credibility substantially outweighs the risks of undue consumption of time, confusion of the issues or unfair prejudice. La. C.E. art. 607 D(2);
 
 State v. Allien,
 
 366 So.2d 1308 (La.1978);
 
 State v. Williams,
 
 258 La. 251, 246 So.2d 4 (La.1971);
 
 State v. Taylor,
 
 593 So.2d 431 (La.App. 2d Cir. 1992).
 

 The introduction of evidence of good character places character at issue, thereby permitting the state to cross-examine the defendant’s character witness about his or her knowledge of the defendant’s particular conduct, prior arrests, or other acts relevant to the moral qualities pertinent to defendant’s crime and to introduce evidence of the defendant’s bad character in rebuttal of the testimony of the defendant’s character witness.
 
 State v. Rault,
 
 445 So.2d 1203 (La.1984),
 
 cert. denied,
 
 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984);
 
 State v. Kelly,
 
 576 So.2d 111 (La.App. 2d Cir.1991),
 
 writ denied,
 
 580 So.2d 666 (La.1991);
 
 State v. Taylor,
 
 07-869 (La.App. 5th Cir.4/29/08), 985 So.2d 266.
 

 Here the defense presented testimony regarding the defendant’s good character, i.e., that he was a loving, non-abusive parent who provided a nonviolent home for his family. Once the defense presented this evidence of ^Givens’ nonviolent character, it opened the door for the state to rebut with evidence of bad character, such as the defendant’s violent history to the mother of his child, a relevant inquiry to the issue of mistreatment of the child. No error in the introduction of the evidence occurred. Thus, this assignment is without merit.
 

 IV.
 

 Givens finally argues that his 37-year sentence is constitutionally excessive because there are too many questions regarding whether he participated in the baby’s death and the facts did not support intentional homicide.
 

 As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses.
 
 State v. Cozzetto,
 
 07-2031 (La.2/15/08), 974 So.2d 665;
 
 State v. McKinney,
 
 43,061 (La. App.2d Cir.2/13/08), 976 So.2d 802.
 

 The test imposed by the reviewing court in determining the exces-siveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article.
 
 State v. Smith,
 
 433 So.2d 688 (La.1983);
 
 State v. Lathan,
 
 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890,
 
 writ denied,
 
 07-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate | ^factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1.
 
 State v. Lanelos,
 
 419 So.2d 475 (La.1982);
 
 State v. Swayzer,
 
 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267,
 
 writ denied,
 
 08-2697 (La.9/18/09), 17 So.3d 388. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation.
 
 State v. Jones,
 
 398 So.2d 1049 (La. 1981);
 
 State v. Ates,
 
 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259,
 
 writ denied,
 
 08-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be
 
 *604
 
 given any particular weight at sentencing.
 
 State v. Shumaker,
 
 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277,
 
 writ denied,
 
 07-0144 (La.9/28/07), 964 So.2d 351.
 

 Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
 
 State v. Smith,
 
 01-2574 (La.1/14/03), 839 So.2d 1;
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993);
 
 State v. Bonanno,
 
 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.
 
 State v. Weaver,
 
 01-0467 (La.1/15/02), 805 So.2d 166;
 
 State v. Robinson,
 
 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379.
 

 The trial judge is given a wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him | gf,should not be set aside as excessive in the absence of a manifest abuse of his discretion.
 
 State v. Williams,
 
 03-3514 (La.12/13/04), 893 So.2d 7;
 
 State v. Thompson,
 
 02-0333 (La.4/9/03), 842 So.2d 330. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing.
 
 State v. Cook,
 
 95-2784 (La.5/31/96), 674 So.2d 957,
 
 cert. denied,
 
 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion.
 
 Id.
 

 La. R.S. 14:31 reads in pertinent part:
 

 B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. However, if the victim killed was under the age of ten years, the offender shall be imprisoned at hard labor, without benefit of probation or suspension of sentence, for not less than ten years nor more than forty years.
 

 The trial court considered the arguments made by both the defense and state during sentencing. The court reviewed the sentencing guidelines found in La. C.Cr.P. art. 894.1. The court stated it based the sentence on the totality of the evidence adduced at trial, the gravity of the offense, the nature of the commission of the offense, and the age of the victim. The court considered as mitigating factors Givens’ misdemeanor prior criminal history and a letter and signatures submitted on behalf of the defendant. The court then sentenced the defendant to serve 37 years at hard labor with credit for time served.
 

 The record exhibits an adequate factual basis for the sentence imposed. The trial court considered the 894.1 factors, as well as mitigating 127and aggravating circumstances. Kartravious McBride, a 22-month-old baby, died after being brutally punched and squeezed. Evidence indicates that the child experienced pain and suffering in the time between the infliction of the wounds and his untimely and senseless death. These facts qualify as nothing short of horrific and disturbing and would have supported a conviction on the charged offense of second degree murder. Thus, the near maximum sentence imposed for the manslaughter conviction cannot be said to be grossly disproportionate to the facts of the offense or shocking to the sense of justice. Accordingly, this assignment is without merit.
 

 Givens’ conviction and sentence are affirmed.
 

 AFFIRMED.