# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-297

**STATE OF LOUISIANA**

**VERSUS**

**DONASTY ANWANIQUE COHEN**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 332,130C
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Phyllis M. Keaty, D. Kent Savoie, and Van H. Kyzar, Judges.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED**

**WITH INSTRUCTIONS.**

**Edward K. Bauman**
**La Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
   **Donasty Anwanique Cohen**

**Hon. Phillip Terrell, Jr.**
**District Attorney**
**Catherine L. Davidson**
**Cheryl A. Carter**
**Assistant District Attorneys**
**Ninth Judicial District Court**
**Post Office Box 7358**
**Alexandria, Louisiana 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
   **State of Louisiana**

**SAVOIE, Judge.**

Defendant, Donasty Anwanique Cohen, was charged by indictment filed on February 22, 2017, with second degree murder, a violation of La.R.S. 14:30.1. Trial by jury commenced on November 7, 2017. Defendant was subsequently found guilty of the responsive verdict of manslaughter, a violation of La.R.S. 14:31. On January 23, 2018, Defendant was sentenced to serve seventeen years at hard labor, without benefit of probation, parole, or suspension of sentence. Defendant now appeals asserting three assignments of error: 1) the evidence was insufficient to support her conviction; 2) her sentence is excessive; and 3) the trial court erred in denying her challenges for cause. For the following reasons, we affirm as amended with instructions.

## FACTS

Defendant and Kenneth Anderson were the sixteen-year old parents of twenty-seven day old Ashtyn Cohen. The three lived in the home of Kenneth's grandmother, Susie Willis. Kenneth's brother, Kalib Anderson (who was fifteen years old at the time of trial), also lived in the home. On January 2, 2017, Susie called 911 because Ashtyn was having trouble breathing. Ashtyn subsequently died, and Defendant was charged with second degree murder in his death.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find an error present.

The trial court erred in ordering Defendant's sentence to be served without benefit of parole.[1]  Defendant was sentenced to serve seventeen years without the benefit of parole, probation, or suspension of sentence.  Louisiana Revised Statutes 14:31 provides, in pertinent part:

> B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. However, if the victim killed was under the age of ten years, the offender shall be imprisoned at hard labor, without benefit of probation or suspension of sentence, for not less than ten years nor more than forty years.

During its recitation of the reasons for the sentence, the trial court noted that because the victim was under the age of ten, the law provided for a minimum sentence of ten years and a maximum sentence of forty years.  Under that sentencing provision, Defendant was ineligible for probation or suspension of sentence.  The sentencing provision, however, requires no restriction of parole eligibility.  The trial court also stated that manslaughter is designated as a crime of violence.  At the time the offense was committed, La.Code Crim.P. art. 893(A) prohibited a suspended sentence for an offense designated as a crime of violence.  Article 893 did not, however, authorize the trial court to restrict parole for an offense designated as a crime of violence.  Thus, the trial court erred in ordering Defendant's sentence to be served without the benefit of parole.  Accordingly, Defendant's sentence is amended to delete the denial of parole eligibility, and the trial court is instructed to make an entry in the minutes reflecting this change.  *See State v. Batiste*, 09-521 (La.App. 3 Cir. 12/9/09), 25 So.3d 981; *State v. Levy*, 08-1467 (La.App. 3 Cir. 6/10/09), 12 So.3d 1135; and *State v. Dupree*, 07-98 (La.App. 3 Cir. 5/30/07), 957 So.2d 966.

---

[1]This issue was raised by Defendant within her excessive sentence claim.

2

# ASSIGNMENT OF ERROR NUMBER ONE

In her first assignment of error, Defendant contends the evidence adduced at trial was legally insufficient to sustain her manslaughter conviction.

> In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court set forth the constitutional standard for testing sufficiency of the evidence, requiring that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Pursuant to La.R.S. 15:438, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

> > Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion. Prosser, [LAW OF TORTS], at p. 212.

> > Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Chism*, 436 So.2d 464, 469 (La.1983).

. . . .

> In reviewing the jury's verdicts, we are not required by constitutional law to determine whether we believe that the evidence establishes guilt beyond a reasonable doubt or even whether we believe the witnesses. *Jackson*, 443 U.S. 307, 99 S.Ct. 2781; *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Rather, we are charged in this case with reviewing the record to determine whether the evidence and the reasonable findings and inferences permitted by that evidence were sufficient to exclude every reasonable hypothesis of innocence. *Chism*, 436 So.2d 464.

*State v. Buteaux*, 17-877, pp. 11-13 (La.App. 3 Cir. 3/14/18), 241 So.3d 1094, 1101-02.

As noted above, Defendant was convicted of manslaughter, which La.R.S. 14:31(A)(1) defines as:

> A homicide which would be [first or second degree murder], but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

The elements of "sudden passion" and "heat of blood" are mitigating factors in the nature of a defense and must be established by a defendant by a preponderance of the evidence. "Provocation and time for cooling off are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control." *State v. Reed*, 14-1980, p. 24 (La. 9/7/16), 200 So.3d 291, 311, *cert. denied*, __ U.S. __, 137 S.Ct. 787 (2017).

Larry Brown was employed by Acadian Ambulance on January 2, 2017. He testified that, on that date, he was dispatched to 385 Cook Avenue. Upon his entry

4

into the residence, Kenneth came out of the hallway and approached Brown with a baby that was face down. The baby was "limp, blue, cyanotic and very gray in color," and Brown knew the baby was in cardiac arrest. Kenneth handed the baby to Brown and stated he did not know what was wrong. Brown began performing CPR at that time, but the baby did not respond. Brown testified that he asked Kenneth what happened but could not get an answer. He then went to the couch where Defendant was sitting. Defendant also stated she did not know what had happened to the baby. Brown testified, "there was no remorse. It's more of when I asked her a question, she just kind of rolled her eyes at me."

Because the room was crowded, Brown took the baby outside and continued CPR. Once the "unit" arrived, he put the baby on a stretcher. That was when he noticed bruising on the baby's right temple, face, and abdomen. When police arrived, Brown showed them the bruising, and they took pictures. Brown indicated Defendant did not approach the ambulance, ask questions, or cry, and was not hysterical. Brown testified that it was not common to see that type of bruising on a twenty-eight-day-old baby.[2] Brown stated the bruising he observed was not from CPR. Austin Rivers and Benjamin Fontenot, employees of Acadian Ambulance, were present as well. They both testified that they saw bruising around both of the baby's eyes, his mouth, and his abdomen.

Officer Samuel Propst arrived on scene when Brown was performing CPR on the baby. Brown asked him to keep people away from the truck so he could continue his efforts to save the baby. Officer Propst observed bruises on the baby's abdomen and head. He and a trainee secured the scene until the crime

---

[2]According to the autopsy report, the baby was actually twenty-seven days old. (State's Exhibit 9.)

scene division and detectives arrived. The occupants of the home, including "the brother, the mother, the father and the grandmother," were transported to the police department for questioning. Officer Propst advised them of their rights, and let them know they would be questioned by a detective.

Juvenile Detective Terrance Howard testified that Susie slept on the couch in the living room; Defendant, Kenneth, and Ashtyn shared a room and a bed; and Kalib had his own room. Detective Howard interviewed Defendant and was questioned about that interview as follows:

Q Tell us - what did she tell you as to the incident?

A Initially she advised that she was asleep. She didn't know what happened. Kenneth woke her up. The baby was gasping. They woke up Ms. Susie. Ms. Susie notified the paramedics. And then they were brought to the police station.

Q Okay. And did she indicate that - so she said Kenneth was holding the baby?

A Right.

Q Did she indicate whether or not Kenneth was feeding the baby or anything? Just holding the baby?

A I think later in the interview she said that Kenneth told her he fed the baby. But I don't think she saw him feed the baby. If that makes a difference. I think she said that he told her he fed the baby.

Q Okay. And what else did she tell you?

A I asked her about the bruising to the baby's face. She said she only noticed the bruises when Kenneth woke her up and told her that the baby wasn't responding - that the baby was gasping for air.

Q Did you talk to her about the bruising on the abdomen and the back of the baby?

. . . .

A . . . I believe she said that she didn't know about them. Kenneth was the one that usually changed the baby. And I think he said vice

6

versa - it was her that usually changed the baby and he didn't know about them.

Detective Howard testified that Defendant indicated Kenneth was the baby's primary caretaker, and Kenneth indicated she was. Detective Howard clarified that Defendant said she saw bruises on the baby's face after Kenneth woke her up.

Detective Howard further testified about his interview with Defendant as follows:

> Ms. Susie - I don't know if it was Ms. Susie's daughter or her sister - Kenneth's aunt, I believe, was there during the day. They played with the baby in the living room. Kalib left to play with friends. Initially I think she went to bed. Kenneth came in with the baby. Kenneth sat on the edge of the bed scrolling through TV guide I believe she said. He handed her the baby. Woke her up, gave her the baby, told her he was going to take a shower. He supposedly left and took a shower, came back. He said that the baby was up. So he went to the kitchen to get a bottle. Came back, fed the baby. After he fed the baby, he said he left to put the bottle back up. When he came back the baby was gasping. He didn't know what to do. He grabbed a syringe, cleared the nose and mouth. The baby still wasn't responding. He woke up Donasty then Ms. Susie and they notified paramedics.

Defendant indicated to Detective Howard that she noticed bruising on the baby after Kenneth took a shower. She had not seen it before that time.

> Detective Howard was further questioned about the interview as follows:
>
> Q  And I believe in the statement you asked her what was Ashtyn wearing and her answer was he had a bruise right before but it looked like it was going away. Do you remember her saying that?
>
> A  Right. Under the chin. Which Detective Bowens or any other advise of a bruise on the chin. The bruising that they told me was the face and abdomen, and then the scabs on the back.
>
>      . . . .
>
> Q  So she indicated she saw bruising on the chin?
>
> A  She did, but I believe she stated she didn't know where it came from.

7

Detective Howard indicated Ashtyn had scabs on his back, indicating old injuries. Detective Howard testified that Defendant either did not know about the scabs or did not know where they came from.

Detective Howard was asked about Defendant's demeanor. He indicated that initially "it was like she just didn't care. Nonchalant. But once the baby passed, she showed a little emotion." Detective Howard described her reaction as a whimper. He thought she began to cry when he told her she would be brought to the Renaissance Home, a detention center for juveniles. He stated that Kenneth "was the same way. He showed no emotion, even after I told him the baby had passed. He was just okay."

Susie told Detective Howard the baby was fine before the "baby went in the room. All parties indicated the baby was fine before he went in the room." Detective Howard testified that Susie told him Defendant and Kenneth were in the room with Ashtyn.

Detective Howard further testified regarding Defendant's knowledge of the events as follows:

> A . . . she seemed she didn't care. She didn't have any knowledge of any of the baby's injuries - the scabs, the bruising, anything. Even asking her did she hear any noise, she said she was asleep.
>
> . . . .
>
> A . . . The baby was in the room with her, in the bed with her. If anything was going on, she should have been aware of it. The baby was crying, screaming - they're in the same bed you know. It's kind of hard for me to believe that she had no knowledge of what was going on when she was right next to the baby, the victim.

Defendant said she never saw Kenneth or Susie hit or abuse the baby. She also stated Kalib "never had the baby," as they did not allow him to "have the baby." Defendant indicated it was not possible that the baby fell. Defendant

reported she left Ashtyn with Susie that day while she went to the store, and Ashtyn was fine upon her return. Detective Howard later testified:

> Based on all accounts, the baby was fine until the baby went in the room with Kenneth and Donasty. Donasty was in the bed, apparently awake when Kenneth came in. According to both their testimony [sic], I believe Kenneth said she was up and he gave her the baby. I believe she said she was asleep and he woke her up and gave her the baby. Both accounts, she received the baby from him. They were in the bed. If anything happened from that time until the time they called the paramedics, [it's] her and Kenneth in the room. I don't see how she wouldn't know what happened.

Detective Howard was further questioned about the bruising as follows:

Q Okay. And Donasty in her conversation with you and her interview with you indicated that she was not aware of the bruising or she did not know where the bruising had come from?

A Correct.

Q Where did she say she saw bruising?

A Around - I believe she said the right eye. I believe he said the left eye. Or vice versa. They both gave the opposite side of the face. But they both indicated that it was bruising to the face.

Detective Howard indicated Defendant initially said she did not know what occurred. She then stated she was asleep, Kenneth brought her the baby, and Kenneth woke her up and told her that Ashtyn was gasping for air or was unresponsive. Detective Howard then asked Defendant what led to Acadian Ambulance arriving at the residence. Detective Howard was then questioned regarding this interaction as follows:

A She said her son stop[ped] breathing.

Q . . . And then you asked how do you know that, is that correct?

A Yes.

Q What was her response?

A She didn't see his stomach moving.

9

Q  Okay.  So the truth is she did know that her son was not breathing, is that correct?  Based on her statement?

A  Yes, sir.

Q  But then you kind of let it go, as good detectives do, and you came back to it, didn't you?

A  Yes, sir.

Q  And her story changed a little bit.  You followed back up by asking about Kenneth being in the shower?

A  Correct.

Q  And then she gave you a different story about what happened when he got out of the shower?

A  I believe she said that he woke her up and said that the baby was gasping for air.

Q  And then they went and got grandmother who called?

A  And she called the paramedics.

Q  So she did observe the baby [be]cause she told you that, correct?

A  Correct.

Q  Because she noticed the baby's stomach was not moving?

A  Correct.

Q  You also asked her at that time, in the beginning of the statement, who was all with her.  Do you recall who she said?

        . . . .

Q  In the room when the baby - she observes the baby's stomach not moving?

A  Her and Kenneth.

Defendant never asked to stop the interview so that she could go check on her son.  Detective Howard did not recall Defendant asking about the condition of the baby.  However, after the first time Ashtyn coded, Officer Littleton called

10

every few minutes to say the baby coded again and to ask what Defendant wanted to do. In response to Officer Littleton's question, Defendant indicated she wanted life-saving efforts to continue.

Detective Torence Bowens was present during Defendant's interview with Detective Howard. He reinforced Detective Howard's testimony, adding that Defendant appeared to be "very detached" during the interview. According to Detective Bowens, Defendant showed a little emotion when she was told the baby died and a lot of emotion when she was told she would be detained at Renaissance Home.

Dr. Christopher Tape was accepted as an expert forensic pathologist. He performed an autopsy on Ashtyn Cohen on January 3, 2017. Dr. Tape opined that Ashtyn was twenty-seven days old and suffered blunt force trauma to the head. Externally, there was a contusion to the right cheek that was eight by seven centimeters. There were hemorrhages in the whites of the eye and the inner eyelid.

The petechial hemorrhages of the eye were a direct result of whatever caused the cheek injuries. Internally, there was hemorrhaging of the right scalp and right temporalis muscle. There was also a left scalp hemorrhage. There was a traumatic brain injury and a subdural hemorrhage, between the dura and the brain, on both sides. There were also subarachnoid hemorrhages in the area of the bridging veins, veins between the dura and the brain, that were broken due to shearing forces, most typically due to acceleration/deceleration. Dr. Tape described shearing forces as "kind of side to side." The corpus clausum, a piece of tissue about half a centimeter wide that connects the two hemispheres of the brain, was torn. Dr. Tape opined that injury may have also been the result of shearing forces, swelling, or from being connected to a respirator. Dr. Tape examined the

11

baby's eyes and found hemorrhages in the retina and the optic nerve. Dr. Tape believed this was caused by brain swelling.

There were blunt force injuries to the external body. There were contusions to the left upper chest, left lower chest, right abdomen, and right lower back. There were also multiple healing lacerations with scabs on the back and multiple healing lacerations where the scabs had been recently removed.

Dr. Tape found injuries to the muscles next to the vertebrae. The eleventh rib on the back side was fractured very close to "where it comes to the vertebrae." There was a hemorrhage and a contusion to the middle portion of the right lung, a contusion or hemorrhage to the diaphragm, and a liver contusion and laceration that extended into the parenchyma. There was also hemorrhaging around the right kidney and the right adrenal, which was probably due to the liver laceration. There was a hemorrhage or bruise on the surface of the esophagus. There was also a hemorrhage to the right hip area, which included "internal injuries along the soft tissue and is actually tracking down into the scrotum." The injuries were the result of blunt force trauma. Dr. Tape testified there were 200 cubic centimeters (cc) of blood in the abdominal cavity and another 200 cc in the right thoracic cavity. Dr. Tape indicated that was a significant amount of blood.

Dr. Tape was then questioned as follows:

Q Okay. Now, the liver and the other injuries that you are talking about - was this a one time or ongoing type of injuries [sic] that you observed during your autopsy?

A These are all roughly the same age. And this child isn't very old, obviously. But there are so many injuries - you can't have an injury to the head and the body. I can take my hand and make a big injury on the body and cover say the liver and the lung and that sort of thing. But I can't cover the head as well. So it would have to be some sort of separate injury.

12

Q  The injuries that was [sic] done to this baby with the liver, would that be within hours or days?  Or how long?

A  One of the things I did in this case, and very typically in a case like this, is I take multiple - make multiple microscopic slides in multiple places of where the injuries are.  And what you can see is when you first get injured, you've got fresh red blood cells and then they become broken down or laced.  And then you sort of get acute inflammation and you get chronic inflammation.  So we have in these injuries anywhere from acute injuries with just intact red blood cells to sort of a little bit of acute and chronic inflammation.  So we're talking days old.  Maybe three days to five days, give or take on the liver and the head injury.  They're not weeks old.  But I can't rule out that they were separate.  You know, it could have been three days and five days.  Because those are overlapping ranges, obviously.

Dr. Tape stated that he gave his opinion in an autopsy report ten percent of the time and did so in this case to support his conclusion that the death of the baby was a homicide.  He read his opinion:

[T]he injuries are acute - which I believe many approximately days old. Although there are injuries involving the liver, it suggests healing as well as the scabs on the back which are both more remote.  I want to add to that, I think the subdural hemorrhage is also probably days old as well.

. . . .

And then I say, . . . a 27 day old infant cannot move extensively on its own and therefore any injuries are either due to accident or intentionally inflicted or both. Given the multiple locations of injuries, including the head and abdomen, and the severity of the injuries including a liver laceration and brain injury, as well as different healing injuries, implying multiple events, the most likely cause of these is intentional infliction, non-accidental trauma . . . .  For these reasons the manner of death of homicide is most appropriate.

He could not determine the order in which the injuries occurred or what caused them.

Dr. Tape further testified as follows:

There's bruises on either side of the cheek.  So, for instance, if you hit a child really hard with an open fist, that would shake the head and the brain and make the shearing injuries. If you took a child and you slammed them against the bassinet, that would make injuries.  One of

the things is that some of the injuries internally can be caused by things that don't leave injuries externally.

. . . .

Babies are pretty pliable. For instance, I think what you're getting at - if I punched a baby in the stomach, I can maybe rupture a kidney or a liver and maybe there might not even be a mark on the external or maybe it doesn't form right away. But the - you know, the kid died before it forms, in other words.

. . . .

. . . [Babies are] very vulnerable actually. But their skin makes it so injuries don't always show up. Sometimes it's a surprise when you have a baby, there's no external injuries and then there's a subdural. That's not the case here. There's a subdural external injuries [sic], rib fracture and internal injuries.

The injuries to the liver were not consistent with CPR. Dr. Tape further described

the causes of blunt force trauma as follows:

Well again, there's nothing on the body that specifically tells me. But there's a number of things that make common sense. You can [use] a fist. You can use an open hand. You can use an elbow. You can use a knee so you can punch somebody in the stomach and rupture the liver. You could hit somebody in the back and fracture the rib and injure the liver perhaps. You could slap somebody on the side of the head and cause the bruise, the petechial hemorrhages and the brain injuries. Infants, I believe, get slammed against bassinets. I have to mention shaking since you're going down that path. In my opinion you can shake a human infant to death. What's called shaken infant is probably more than that usually. . . . But a shaking could explain brain injuries but it wouldn't explain the liver injury, for instance, or the rib fracture typically.

Dr. Tape was asked if shaking could explain the acceleration/deceleration brain

injury he referred to. He responded:

So the brain is kind of free floating there. And if it moves enough it's going to break those bridging veins and that starts a bleed. And that's your subdural hemorrhage which eventually kills you. . . . Shaking is a blunt force injury; it's an acceleration/deceleration.

14

Dr. Tape indicated a baby sustaining such injuries would feel pain and typically cry. There would be inflammation, so the baby would feel and look sick. If there were just internal injuries, a parent might not know and think the child was fussy. A layperson would detect external injuries when bathing and dressing the child and changing his diapers. Dr. Tape thought it would be hard to miss the injuries.

The rib fracture was "[w]ithin days old." Assuming the liver injury was in place, the baby "would probably not want to eat at all. It would probably be shutting down the whole digestive tract would be my guess." Dr. Tape believed Ashtyn died as a result of the combination of his injuries.

Dr. Olga Zand worked in pediatric intensive care. She was called to the emergency room on January 2, 2017, because a newborn baby had been intubated, was in respiratory failure, and had no pulse. She explained the measures employed to save Ashtyn's life. Dr. Zand indicated that a specialist took pictures of the back of Ashtyn's eyes, and retinal hemorrhage was observed. She stated that was consistent with "inflicted child injury." She reached out to the parents, through police, and informed them that attempts to save the child's life were futile. Dr. Zand recommended stopping those efforts. Once Dr. Zand saw the retinal pictures and blood work, she again reached out to the parents and said there was a pulse, but if the child went back into cardiac arrest, he could never be the same. She worked on Ashtyn for three hours and fifteen minutes. He was actively bagged throughout his stay in the pediatric intensive care. She noted multiple bruises to the back, the right cheekbone, and the left temporal region under the eye. Ashtyn also had scratches on his back and "bruising anteriorly." Nurses took photographs

15

of the injuries.  Dr. Zand believed that a very significant event would have had to occur for Ashtyn to have gone into cardiac arrest.

Karen Hall testified that her nephew is Kenneth Anderson, the baby's father, and that Defendant and Kenneth lived at the home of Karen's mother.  Karen testified that she visited her mother's home on January 1, 2017, at approximately 11:00 or 12:00.  During that time, she held Ashtyn, and he started crying.  She then stated, "Not really crying, just yelling" and "squalling."  Karen testified that she told Kenneth something was wrong with Ashtyn and handed the baby back to Kenneth.  When she handed the baby over, the baby "kind of like jerked."  She further stated, "[l]ike shivering."  She did not see any bruises on the baby.  However, he was clothed at that time.

Susie Willis testified that Kenneth is her grandson.[3]  Defendant moved into Susie's home approximately a week before Thanksgiving, while Defendant was pregnant.  Defendant gave birth in December and brought Ashtyn to Susie's house.  Although Susie was retired, she did not babysit, feed, bathe, or change Ashtyn, and denied bruising the baby.  Susie indicated Defendant took care of Ashtyn, bathing and dressing him.  She saw Kenneth change the baby's diapers and feed him, but she never saw Kenneth bathe or dress the baby.  Susie stated Ashtyn did not cry a lot and "seemed to be a pretty good baby."  She further stated Ashtyn did not seem sick.

Susie was asked about Friday at the end of December.[4]  She indicated that Kenneth went out and did not get back until Saturday at noon.  During that time,

---

[3]Susie referred to Kenneth by his middle name Wayne during her testimony.

[4]The parties did not give dates for the days they discussed.  After reviewing the bill of information and consulting a calendar for the months of December 2016 and January 2017,  we

Ashtyn cried, and Defendant asked Susie if she would take him for a while. Susie played with Ashtyn, and he eventually calmed down. Defendant returned for the baby about ten minutes later. Defendant "went back into the room and I didn't see the baby anymore."

Susie further testified that after Kenneth got back Saturday, Defendant and Kenneth bickered on and off. He went outside to play ball, and the arguing resumed when he went back inside, and he left and then returned again. During the arguments, Defendant and Kenneth were in the bedroom with Ashtyn. Susie stated they argued about Kenneth being out all night. At approximately 5:00 p.m., Susie asked what was wrong, and Kenneth said, "nothing." Kenneth was subsequently walking around the house really fast, and Susie told him that if he kept it up he could have a seizure. Seconds later, Kenneth had a seizure. He was transported to the hospital by ambulance at approximately 5:30 p.m. and returned home at almost 11:00 p.m. Susie testified that Kenneth had previously suffered a head injury while playing basketball, began having seizures, and was placed on medication. Kenneth was put back on a full dose of his medication after his seizure, and Susie indicated Kenneth went to sleep when he returned home. While Kenneth was at the hospital, only Defendant and the baby were left at home.

After Susie returned from the hospital, she went to church. She got back home around 2:00 a.m. on January 1, 2017. She then went to bed because she had to get up at 9:00 a.m. for Sunday school. Kenneth and Defendant were in bed asleep at that time, and Ashtyn was sleeping in his bassinet. Susie and Kalib returned to church Sunday and were there from 9:45 a.m. until 1:00 p.m. Susie's

assume the testimony refers to Friday, December 30, 2016; Saturday, December 31, 2016; Sunday, January 1, 2017, and Monday, January 2, 2017.

17

daughter, Karen, went to Susie's home after church to eat. Karen held Ashtyn and told Susie that something was wrong with the baby. Karen was at Susie's home until 8:00 p.m. Sometime later, Susie went to bed. She was awakened by Kenneth asking her to call an ambulance because Ashtyn was not breathing. Susie gave Kenneth the instructions relayed by the 911 operator, and he followed them. During that time, Defendant was standing in the doorway of her bedroom talking on the phone and texting. Defendant never assisted Ashtyn. Susie did not see any bruises on Ashtyn at that time. Kenneth did not put his hand in Ashtyn's face while Susie was instructing him, as she watched what he was doing. Kenneth used two fingers to pump the baby's chest. Ashtyn was clothed, and Kenneth did not remove the clothing. The baby had milk in his throat, and Kenneth tried to clear his airway.

When the ambulance arrived, paramedics came into the house, and Ashtyn was taken from Kenneth and brought outside. Kenneth went outside after the paramedics, and Defendant later followed. Police subsequently brought all four of them to the police department. Susie and Kalib left from there at 9:00 a.m.

When asked if she saw Defendant use wipes on the baby, Susie indicted that she saw Defendant with a blanket that she went into the bathroom to wet. Susie did not know what Defendant used this blanket for.

Susie had no relationship with Defendant. Defendant did not speak to her. When asked how often she saw Defendant in a twenty-four-hour period, Susie said, "None." Susie then testified that she might have seen Defendant twice a day because Defendant would go to the bathroom. Most of the time, Defendant stayed in her room. However, Kenneth was active and went outside. Susie never saw Kenneth or Defendant strike Ashtyn.

18

Kalib testified that Kenneth did not come home Friday night, but he, Susie, Defendant, and Ashtyn were home. Ashtyn was in the room with Defendant. Defendant spoke to Kalib once Friday night, asking where Kenneth was. Defendant then returned to her bedroom. Kalib was home Saturday until "[f]ive something," which was after Kenneth had a seizure. He left for an hour. Defendant did not leave the bedroom after he returned home. Kalib then went to church with his grandmother and returned home Sunday morning. Sunday evening, he saw Kenneth walking around, and Defendant was in the bedroom with Ashtyn.

Kalib's grandmother woke him up saying she needed help calling an ambulance. Kenneth tried to save the baby after that call by doing CPR. Kalib testified Kenneth was crying, and Defendant was standing in the bedroom door on the phone. She was also crying.

Kalib never babysat, fed, or changed Ashtyn. Kalib testified that Kenneth sometimes cared for Ashtyn, feeding and changing his diapers. However, Defendant took care of Ashtyn most of the time. Kalib did not see Kenneth do anything else for the baby. Kalib indicated Susie sometimes watched Ashtyn.

Defendant argues that the State failed to prove she committed acts of gross negligence that constituted cruelty to a juvenile and resulted in Ashtyn's death, nor did the State prove she was a principal to the acts of Kenneth or anyone else. Defendant contends she has no explanation for the injuries and did not attempt to conceal them. Additionally, she argues that she was not the only person with the opportunity to inflict the injuries Ashtyn sustained. Furthermore, there was no evidence that she stood by and watched her child be beaten by a family member. Defendant argues it is a reasonable hypothesis that Kenneth, Kalib, or Susie hurt

19

the baby without her knowledge, and, due to her immaturity and inexperience with children, she did not see the signs of abuse. Defendant contends the evidence is insufficient to sustain a conviction for manslaughter or a conviction as a principal to manslaughter. Defendant avers that, at most, she may be guilty of negligent homicide. She requests that her conviction be reversed for these reasons.

Cruelty to a juvenile is set forth in La.R.S. 14:93 and is defined as: "The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense[.]" Defendant was sixteen years old at the time of the offense. Thus, La.R.S. 14:93 does not apply to Defendant.

We will now address Defendant's claim regarding sufficiency of the evidence to support her conviction for manslaughter. In *State v. Thornton*, 47,598 (La.App. 2 Cir. 3/13/13), 111 So.3d 1130, the defendant was convicted of second degree murder in the death of his three-month-old son. The child died as the result of a skull fracture caused by the defendant. On appeal, the defendant argued that he should have been found guilty of manslaughter. The second circuit noted the defendant informed police that he injured the child in order to hurt the child's mother, Ursula, who was his girlfriend. The defendant was angry because Ursula did not inform him she was going to stay out all night, he did not approve of who she was hanging out with, and he suspected she was cheating on him. The second circuit addressed provocation sufficient for manslaughter as follows:

> [T]he measure of the "provocation sufficient to deprive an average person of his self-control" cannot be met by reference to the crying and discomfort of an innocent victim only three months old. The average person understands that no anger, much less anger accompanied by force and harm, is a reasonable response to an infant.

With provocation totally irrelevant as an adult response in such instance, Thornton's asserted provocation by Ursula can likewise not be transferred so as to make in any manner his violence against the child less culpable. There is no reasonable correlation providing a degree of justification between TJ's crying, the defendant's anger over Ursula's petty and vengeful acts, and the brutality that Thornton showed his own son.

Thornton failed to prove, by a preponderance of the evidence, that circumstances existed such that he was so provoked by sudden passion or heat of blood that he was deprived of an average person's self-control and cool reflection. *State v. Logan*, [45,136 (La.App. 2 Cir. 4/14/10), 34 So.3d 528, *writ denied*, 10-1099 (La. 11/5/10), 50 So.3d 812]. Thus, the evidence was sufficient to support a conviction for second degree murder.

*Id.* at 1136-37.

Based on the ruling in *Thornton*, we conclude that the evidence does not support the verdict returned by the jury, and the jury's verdict may have been a compromise verdict.

A jury has the prerogative to compromise and render a lesser verdict whenever it could have convicted as charged. *State ex rel. Elaire v. Blackburn*, 424 So.2d 246 (La.1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). A compromise verdict is a verdict which does not "fit" the evidence, but which the jurors deemed to be fair. *Id.* Where a defendant fails to interpose a timely objection to a legislatively provided responsive verdict which is not also a lesser and included offense of the crime charged, a conviction will not be reversed if such a verdict is returned, regardless of whether the verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. *Id.* . . . It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise verdict" will be returned and then to raise the complaint for the first time on appeal. *Id.*

*State v. Stafford*, 17-714, p. 21 (La.App. 3 Cir. 3/7/18), 241 So.3d 1060, 1075.

The indictment in this case charged Defendant with second degree murder, a violation of La.R.S. 14:30.1(A)(1), which provides that second degree murder is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Specific criminal intent is defined as "that state of

mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances and the defendant's actions. It may also be inferred from "'the extent and severity of the victim's injuries.'" *State v. Julien*, 13-1327, p. 13 (La.App. 3 Cir. 5/21/14), 139 So.3d 1152, 1160, *writ denied*, 14-1406 (La. 5/15/15), 169 So.3d 383 (quoting *State v. Patterson*, 10-415, p. 11 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037).

The pertinent question in this case is who inflicted the injuries that caused Ashtyn's death. In *Julien*, 139 So.3d 1152, the two-and-a-half month old infant was transported to the hospital by paramedics after his father, the defendant, called 911 because the baby had become unresponsive. At the hospital, it was determined that the baby had a skull fracture which caused a subdural hemorrhage and twenty-five fractures on fourteen of his ribs. Dr. Tape determined the rib fractures were two weeks old, and the skull fracture occurred three to ten days prior to the baby's death.

Testimony in *Julien* indicated that the defendant lived in a one-bedroom apartment with Natasha Daniels, his girlfriend and the baby's mother; Daniels' three children; the baby; a friend; the friend's boyfriend; and the friend's two young children. On June 6, 2011, the baby's mother worked from 11:00 a.m. to 5:00 p.m. After Daniels got home from work, she fed the baby and did not see any bruising on his body or see him wince as if he was in pain. The defendant and Daniels horseplayed while she was holding the baby, but he was not injured at that time. Daniels subsequently left with the friend who lived in the apartment. At

22

approximately 10:22 p.m., Daniels received a call from the hospital regarding the baby.

The defendant in *Julien* gave Daniels conflicting versions of what happened to the baby. However, she never saw the defendant harm the baby. Daniels indicated that other than a few hours spent with each of her two sisters, only she and the defendant took care of the baby. Daniels further indicated that the baby stayed with the defendant's mother for several days approximately two weeks before his death. The defendant told police the baby had rolled off the bed and may have hit his head on a board that was between the wall and the bed. The defendant stated he knew no one who had hurt the baby and denied that Daniels or anyone else in the apartment had harmed the baby. The defendant also adamantly denied harming his son.

This court found:

Defendant is correct in that the only evidence given at trial to establish the offense of second degree murder was the fact that he was the primary caregiver and that the child was in his care the day of the discovery of the injuries, which does not establish the necessary element of specific intent to kill or inflict injury or unjustifiable pain or suffering. However, the baby's injuries themselves, could exhibit, at the very least, Defendant's specific intent to inflict great harm upon him.

. . . .

In the current case, Defendant postulated that the skull fracture occurred when the baby rolled off a bed eighteen inches from the floor and hit his head on a board. He also stated that the baby could have hit his head on a ceramic mug when, as he sat on the bed, he dropped the baby "playfully." The jury did not find these explanations for the baby's injuries credible, and we will not second-guess that credibility determination. *See Lambert*, 720 So.2d 724.

. . . .

In the current case, Defendant testified that he was the babies' [sic] primary caregiver, particularly after he lost his job from Wal–

Mart in May. He stated that other than one night at his mother's house, the only other person to care for the child was Ms. Daniels' sister, who took care of the baby for several days. Ms. Daniels' testimony was that each of her sisters had only spent a few hours with the baby. Prior to the baby's May visit to the hospital, there was testimony that the baby had a loud cry. Ms. Daniels testified that after the baby was discharged from the hospital in May, his cry was very low and hard to hear. However, while Dr. Tape stated that rib injuries could have caused the baby to have a weak cry, no rib injuries were detected when the baby was admitted to the hospital in May.

We conclude that the evidence was sufficient to exclude any reasonable hypothesis of innocence that anyone other than Defendant inflicted the injury which resulted in the baby's death.

*Julien*, 139 So.3d at 1160-61. This court went on to affirm the defendant's conviction. The skull fracture occurred three to ten days prior to the baby's death. However, testimony regarding the acts of the people living in the apartment focused on the day the baby was transported to the hospital.

In *State v. Jackson*, 15-393 (La.App. 3 Cir. 11/4/15), 179 So.3d 753, *writ denied*, 15-2191 (La. 5/2/16), 206 So.3d 877, a two-year old died as the result of a transecting duodenal perforation after being cared for by the defendant, the mother's boyfriend. According to the child's mother, Latricia Hunt, the night before the child was brought to the hospital he felt as though he had a fever, had abdominal pain, and had vomited. He slept with his mother and awoke around 9:00 a.m. but would not eat. Around 10:30 a.m., the child was nonresponsive and limp. The mother's cousin brought them to the hospital. Two blocks from the hospital, the mother noticed the child was not breathing.

In *Jackson*, Dr. Tape found rib fractures that were one to three weeks old and others that were three to six weeks old. Dr. Tape opined that the duodenal perforation likely occurred at least twenty-four hours prior to death, and the child was dead for perhaps a few hours before being brought to the hospital.

24

This court in *Jackson* addressed the matter stating: "The unrebutted testimony and evidence, which is not challenged by the defendant, clearly indicates that Derrion died as a result of cruelty to a juvenile and that there were only two people who could have possibly committed that offense: [The d]efendant and Ms. Hunt." *Id.* at 766. This court set out the following timeline in its opinion:

**Summer 2011** . . . . [the d]efendant and Ms. Hunt began dating and living together on and off.

**August 5, 2011** . . . . Derrion was brought to the hospital. He complained of stomach and rib pain. Ms. Hunt gave a history of Derrion being accidentally hit by a swing while in the care of [the d]efendant. According to the medical records and testimony of Dr. Howes, the chest x-ray did not show broken ribs.

**October 7, 2011** . . . . Derrion was brought to the hospital for a burn to his right hand (2nd degree burn) which happened on October 4, 2011. History from mother said it was a hot grease burn. The chest x-ray did not show any broken ribs.

**November 7 to December 12, 2011** . . . . Dr. Tape testified that Derrion's rib fractures occurred from one to six weeks from the date of his death.

**December 8, 2011** . . . . Ms. Sam [Derrion's aunt] testified that Derrion had a bruise on his forehead and scratches on his face. Derrion said that [the d]efendant hit him, but Ms. Hunt testified that [the d]efendant said Derrion hit his head on the wall.

**December 18, 2011**:

**Morning** . . . . According to Ms. Hunt, [the d]efendant arrives at home.

**11:42 a.m.** . . . . According to Dr. Tape and the autopsy report, the best estimate of when the injury occurred to the duodenum (twenty-four hours before Derrion was pronounced dead at 11:42 a.m.). Both [the d]efendant and Ms. Hunt could have been present.

**3:00 or 4:00 p.m.** . . . . According to Ms. Hunt, she goes to work.

**4:30 p.m.** . . . . According to [the d]efendant's mother, she dropped off [the d]efendant at Ms. Hunt's home.

**10:20 p.m.** . . . . Ms. Hunt returns to her home.

25

**December 19, 2011**:

**1:42 a.m.** . . . . Dr. Tape admitted the injury could have occurred this late (ten hours before Derrion was pronounced dead at 11:42 a.m.). Both [the d]efendant and Ms. Hunt were with Derrion.

**1:42 a.m. to 3:42 a.m.** . . . . According to Dr. Fruge, the earliest the injury occurred (eight to ten hours before Derrion was pronounced dead at 11:42 a.m.). Both [the d]efendant and Ms. Hunt were with Derrion.

**5:42 a.m. to 6:42 a.m.** . . . . According to Dr. Fruge, the best estimate of when the injury occurred (five to six hours before Derrion was pronounced dead at 11:42 a.m.). Both [the d]efendant and Ms. Hunt were with Derrion.

**5:04 a.m. to 9:04 a.m.** . . . . Dr. Tape estimates Derrion died based upon his body temperature taken upon arrival at the hospital, 11:04 a.m. (two to five hours before it was taken).

**9:00 a.m.** . . . . [the d]efendant leaves Ms. Hunt's home.

**9:00 a.m. to 11:00 a.m.** . . . . Ms. Hunt and Tiffany [Ms. Hunt's cousin] testified Derrion was still responsive.

**11:04 a.m.** . . . . Ms. Hunt arrives at the hospital with Derrion, DOA (dead on arrival), according to the medical records. Derrion's body temperature is 93.3 degrees Fahrenheit.

**11:42 a.m.** . . . Derrion is pronounced dead.

*Id.* at 767-68.

In *Jackson*, this court concluded:

According to the unrebutted testimony of the experts, the timeline shows that [the d]efendant was present during all the times when the injury likely occurred. Although the evidence indicates Ms. Hunt was more than likely present when the trauma occurred, no evidence was presented to prove Ms. Hunt committed the abuse. Thus, we find that the jury obviously and reasonably rejected any hypothesis of innocence based on Ms. Hunt having committed the crime.

*Id.* at 768. The court further found:

In applying the *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)] standard when the conviction is based on circumstantial

evidence, we find that the evidence admitted at trial clearly and strongly indicates that [the d]efendant was the perpetrator. As noted above, [the d]efendant and Ms. Hunt were the only possible people who could have committed the offense. No evidence was presented to show that Ms. Hunt was the abuser. Additionally, there was unrebutted testimony that on at least three other occasions when the child was in the care of [the d]efendant, the child was injured. Moreover, the unrebutted testimony of the experts indicates that [the d]efendant was present at the time when the injury occurred. Thus, after viewing all of the evidence in a light most favorable to the prosecution, we find it is sufficiently reasonable that a rational juror could have found proof of guilt beyond a reasonable doubt. Therefore, we affirm [the d]efendant's conviction.

*Id.* at 770. *Jackson* is similar to the case at bar in that the two caregivers were most likely present when the child was injured. However, it is distinguishable from the case at bar in that there was testimony regarding three other occasions when the child therein was injured while in the care of the defendant.

In *State v. Strother*, 09-110 (La.App. 3 Cir. 10/7/09), 19 So.3d 598, *aff'd in part, reversed in part*, 09-2357 (La. 10/22/10), 49 So.3d 372, the defendant, who was the boyfriend of the child's mother, was convicted of attempted second degree cruelty to juveniles and cruelty to juveniles. This court reversed the defendant's conviction for attempted second degree cruelty to juveniles on the ground that the state failed to present sufficient evidence to support that verdict or a verdict for any other possible lesser and included offense. On review, the supreme court discussed the evidence as follows:

The evidence at trial established that on the afternoon of February 2, 2007, Effie LeBleu, a 26–year–old mother of several children, two of whom lived with her at home, appeared at the Cabrini Hospital in Glenmora, Louisiana, with her eight-month-old daughter. According to Vanessa Barnes, a registered nurse on duty in the emergency room that day, the baby was covered with bruises, in pain, and "just very unsettled, very distressed." The child was so unsettled, and remained that way for "hours," that Barnes was unable to lift or hold her in her arms. She just "kind of cradled her in a sheet and never actually grabbed her." The baby was admitted, and on the following day, Dr. Amarjit Nijjar examined her in the hospital's emergency

room and determined that, in effect, she had been battered from head to toe. Dr. Nijjar testified that the baby "had multiple bruising on the face, on the head, on the right side of the face, on the left side of the jaw, back of the neck, both ears were all red and swollen up." The baby's upper lip was swollen and bruising extended from the right side of her body across her abdomen and over both buttocks and down both thighs to her calves. The bruises appeared of different ages. They were bilateral, and they were "all over," an unmistakable sign, in the doctor's opinion, of deliberate and systematic abuse. The doctor detected a hematoma under the muscle in the baby's hip area and noticed that the child had difficulty moving her left arm, which also displayed significant bruising. An x-ray determined that the humerus bone of her left arm appeared fractured at the elbow. The x-ray also revealed evidence of an older fracture at the same point. Dr. Nijjar testified that he became so upset by the appearance of the eight-month-old child that he had to step outside of the examination room to gather himself.

In the opinion of Dr. Mark Dodson, an orthopedic surgeon who also examined the baby on February 3, 2007, the x-ray of the child's elbow revealed a relatively new fracture, which had probably occurred within the prior three days, and displayed signs of an older fracture in the same area occurring anywhere from two to four weeks before he examined the child. The orthopedist testified that the fractures, new and old, of the baby's elbow would not have been caused by a toddler falling as she attempted to walk but by "a twisting injury or a fall from a height."

The child's mother testified at trial and described for jurors the events prompting the hospital visit on February 2, 2007. Effie LeBleu testified that at the time of the injury she was living in a trailer owned by defendant's mother with defendant and two of her children. In the early morning hours of February 2, 2007, she awoke to the sound of her eight-month-old daughter crying. She testified that defendant would not let her out of bed because her children "were very, very spoiled to me, and he didn't like the idea that my kids were spoiled." Defendant got up instead and took the child into the laundry area to change her. Ms. LeBleu then heard a "boom boom" sound. When he returned with the child, defendant explained that the baby had "wiggled" away from him. At that time, she did not question the explanation because the child could not walk and often wiggled or squirmed when she moved. The baby stopped crying when defendant put the child down on the mattress but the child wiggled off her bedding after losing her pacifier. Defendant responded by grabbing a belt. According to LeBleu, when she implored defendant not to hit her daughter, he replied, "I wasn't going to, I was just thinking about it," and he hit her instead on her hand underneath a blanket.

28

Later in the morning, at approximately 7:00 a.m., Ms. LeBleu woke up and noticed bruises on the baby's leg. However, she did not notice any impairment of the child's left arm. When asked why she did not immediately summon help for her baby, Ms. LeBleu explained that she did not have a phone, and defendant carefully monitored her telephone calls on his own phone. He otherwise kept her isolated from family and friends with the help of his own mother who lived nearby. Instead of reporting the problem immediately, Ms. LeBleu went shopping for diapers with defendant and her daughter, and after they returned home, defendant went fishing for the day. Ms. LeBleu seized on the opportunity to seek a neighbor's help. Thereafter, she contacted the Glenmora Police, and they called Cabrini Hospital. Ms. LeBleu then brought her baby to the hospital that afternoon at approximately 2:00 p.m., and the child was admitted immediately.

Ms. LeBleu informed jurors that defendant had struck her daughter on the hand with a fly swatter when she cried, that he could not stand the baby crying, and that he would "whip" the child for crying. Defendant had also hit Ms. Lebleu with a belt in the past. She further acknowledged that she had given birth to six children beginning at age 15 and that she had lost them all in one fashion or another, in part because social services became involved in her life virtually at the outset of her child bearing years after she moved out of her parents home and became pregnant with her first child when she was 14 years old. Ms. LeBleu explained that her first child died of SIDS, although the death certificate listed the cause as undetermined. She gave up her next two children to her sister to forestall social services from removing them from the family altogether. Her fourth child resided elsewhere in Louisiana with his father, and her fifth child, a son, and sixth, her daughter and victim in the present case, were removed from the trailer home she shared with defendant following the incident on February 2, 2007. The children were subsequently adopted. Ms. LeBleu testified that the children were removed from the home because she had failed to contact the authorities for several hours after noticing the bruises on her daughter's legs, and she denied abusing either of them.

. . . .

Defendant did not testify at trial but in a statement to the police following his arrest, he related that he had been living with Effie LeBleu and two of her children in the trailer for approximately six months. He had moved in three days after meeting Ms. LeBleu. Defendant told the police that when the baby began crying in the early morning hours of February 2, 2007, Ms. LeBleu would not wake up, and so he got up to change the child. He took her into a hallway which served as a laundry area and put her on the washing machine. After he changed her and began pulling up her pants, she "jumped" out of his

hands and fell face first into the control panel of the dryer next to the washing machine. Defendant denied that the baby fell to the floor but told the police that he noticed bruises on her face after he brought her back from the laundry area and placed her on a mattress. In his opinion, Effie LeBleu had spoiled her children, and defendant acknowledged that he became the disciplinarian in the family for both the baby and her three-year-old brother and that he had once struck the baby with a fly swatter. Defendant further acknowledged that he had never seen Ms. LeBleu abuse the children, but he also stated that he did not spend that much time in the trailer.

Defendant also gave a statement to Ray Cooper, a child protection investigator for the Office of Community Services. According to Cooper, defendant informed him that when he awoke to the sound of the baby crying, and Ms. LeBleu would not wake up, he picked up the child despite a bad back which had placed him on disability, and, "as he's going into the washroom he dropped her." "That was his statement," Cooper recalled, "the child jumped out of his hands."

Defendant's parents testified in his defense. Both Jimmy and Fay Strother saw defendant, Effie LeBleu, and the two children when they were buying diapers on the morning of February 2, 2007. Although defendant and Ms. LeBleu stated that the baby was bruised at that time, defendant's parents denied seeing any bruises. Jimmy Strother further testified that Ms. LeBleu improperly pulled the baby out of her carriage by grasping only one arm, "and that wasn't the proper way to do a child, a baby." For her part, Fay Strother claimed that it was Effie LeBleu, not defendant, who used a belt and fly swatter on the baby. Mrs. Strother also testified that she saw Ms. LeBleu throw the baby on the couch, causing the child to fall off and hit her head on the floor, giving rise to knots on her forehead. Although Mrs. Strother testified that she never saw defendant hit the baby, when asked whether she would be shocked to hear that he hit the baby with a fly swatter, she stated, "not really." She also admitted that she had seen defendant "pat" the baby on her bottom, but denied that he whipped the child.

*Strother*, 49 So.3d at 374-76.

In *Strother*, the state charged that the second degree cruelty to juveniles was committed on or about February 2, 2007, the day the defendant was alone with the victim changing her diaper. The only issue at trial was which one of the two adults living in the trailer committed the abuse. Defense counsel argued that LeBleu

30

caused the victim's injuries during the few hours she spent alone with her children before taking the victim to the hospital after the defendant left on his fishing trip and they had been seen by the Strothers shopping. The possibility that the abuse occurred during those hours was bolstered by LeBleu's testimony that the victim stopped crying and went back to sleep after the diaper-changing incident, yet appeared distressed when they arrived at the hospital shortly after 2:00 p.m. that afternoon.

The supreme court noted that this court found the state did not prove beyond a reasonable doubt that the defendant, as opposed to LeBleu, had fractured the victim's arm. This court further noted there was no testimony indicating the defendant was alone with the victim when the injury to her arm occurred, and there was minimal testimony or other evidence given regarding acts committed intentionally or negligently by the defendant that would have resulted in the injury to the victim's arm. The supreme court stated the only evidence that the defendant could have caused the injury came from the testimony of Cooper regarding the defendant's statement that he had dropped the baby on the way to the laundry area. This court dismissed that testimony as a "second-hand report." *Jackson*, 19 So.3d at 608. While LeBleu testified she heard a boom in the laundry area, she only noticed bruises and did not report any impairment of the victim's arm. This court did not find that the defendant refused to seek medical attention for the victim's injured arm because there was no evidence which established that he was aware of the injury. The supreme court addressed the case as follows:

> In the present case, and in a decision seemingly at odds with itself, the court of appeal found that jurors rationally and reasonably rejected defendant's hypothesis of innocence, that Effie LeBleu inflicted numerous and varied injuries on her own daughter, as reflected by the extensive bruising all over her body, when it found

31

him guilty on the count charging cruelty to juveniles, but acted irrationally when it rejected defendant's same hypothesis of innocence offered on the count charging him with second degree cruelty to juveniles involving the specific trauma which fractured the child's arm at the elbow. However, to reach that result with respect to the more serious charge of second degree cruelty to juveniles, the court of appeal had to reverse perspectives and view the evidence in a light most favorable not to the state, but to the defendant. Thus, its observation that "[w]hile the diaper-changing incident occurred within the time frame of when the doctors theorized the injury occurred, Defendant's account of what happened did not indicate an injury to the baby's arm occurred at that time," *Strother*, 09-0110 at 7, 19 So.3d at 603, simply acknowledged that there was no *direct* evidence that he caused the injury at that time, just as there was virtually no direct evidence, apart from Effie LeBleu's testimony, and defendant's statement, about his use of a fly swatter on at least one occasion, that he had also caused the bilateral bruising of the child from head to toe over the extended period of time alleged in count two of the bill of information, although the jury held him fully accountable for that conduct in a verdict affirmed by the court of appeal.

However, viewing the evidence from the correct, pro-prosecution perspective, Judge Amy, dissenting, observed that "the jury could have found this [statement about the diaper change] inconsistent with the degree of bruising and injury, including a fractured arm, discovered at the hospital." *Strother*, 09-0110 at 1-2, 19 So.3d at 614 (Amy, J., dissenting). In fact, defendant gave not one but two accounts of what happened, one to the police, and the other to Ray Cooper, the child protection investigator, and the statements conflicted. The statements purported to give alternative exculpatory accounts, that the child either squirmed away from defendant just after he had changed her on the washing machine and pitched face first into the back panel of the dryer, but did not fall to the floor, or that she had jumped out of his arms and fell to the floor as he carried her to the laundry area to change her. The court of appeal discounted as a "second-hand" report defendant's statement to Ray Cooper, but under Louisiana law, the statement constituted non-hearsay evidence admissible for a fact finder to assess as substantive evidence in the context of the other evidence in the case. La.C.E. art. 801(D)(2)(a) (exempting from hearsay rule a statement offered against a party which is "[h]is own statement, in either his individual or a representative capacity."). *Any* rational trier of fact would find the inconsistency in defendant's statements highly significant because it provided an evidentiary basis for concluding that neither account of an inadvertent, accidental fall caused by the child's squirming and wiggling was true, yet both statements acknowledged that some sort of incident had taken place in those early morning hours when defendant was alone with the baby, after which, hours later, the mother then appeared at the hospital emergency room alone with her

badly battered child with a freshly broken arm while defendant went fishing. Defendant's statement to the police further acknowledged that Effie LeBleu did not abuse the children and that he, not her, was the disciplinarian in the family because he shared her view that the children were "spoiled to her." As [J]udge Amy observed, given defendant's admission that he *disciplined* an eight-month-old baby, rational jurors could reasonably find "evidence of the defendant's rage" in Effie LeBleu's testimony that defendant grabbed a belt to strike the baby moments after she heard the thumping sound from the laundry area, because defendant generally could not tolerate the baby's crying and could not rely on her to discipline her own children, and "concluded that the abuse was occurring at the time of the loud noise and while out of [her] sight." *Strother*, 09-0110 at 1, 19 So.3d at 614 (Amy, J., concurring in part and dissenting in part).

Our independent review of the record shows that jurors had a full and fair opportunity to consider defendant's hypothesis of innocence and weigh the inferences from testimony that the baby settled down after the diaper changing incident but was then unsettled and distraught hours later when she arrived at the hospital. Jurors clearly found the testimony of Effie LeBleu credible, whatever reservations they may have shared with the prosecutor about her capabilities as a mother. Viewing the evidence in a light most favorable to the state, and according due weight to the credibility determinations made by the jury, we conclude that the jury reasonably rejected defendant's hypothesis of innocence and found that he had been abusing the child during the time they lived together with the mother in the trailer and then caused the fracture of her arm when he was alone with her in the early morning hours of February 2, 2007. No other alternative hypothesis is apparent from the record and the lesser verdict of attempted second degree cruelty to juveniles did not necessarily reflect doubts about the sufficiency of the state's evidence to prove the charged offense because Louisiana's system of responsive verdicts provides juries with the plenary power of nullification to return a lesser verdict even in the face of overwhelming evidence of guilt. *See State v. Porter*, 93-1106, p. 4 (La.7/5/94), 639 So.2d 1137, 1140 ("Treating the jury's prerogative to return a responsive verdict similar to the jury's power of nullification, this court has consistently held that the jury must be given the option to convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged offense.").

The court of appeal therefore erred in reversing defendant's conviction and sentence on the count charging second degree cruelty to juveniles.

*Jackson*, 49 So.3d at 378-80. We note that the injury occurred within three days of the child being brought to the hospital. However, testimony focused on the day the child was brought to the hospital.

In *State v. Tensley*, 41,726, p. 17 (La.App. 2 Cir. 4/4/07), 955 So.2d 227, 239, *writ denied*, 07-1185 (La. 12/7/07), 969 So.2d 629, the second circuit stated that contrary to the defense argument that neither defendant was shown by direct evidence to have inflicted the beatings on the five-month-old that died as a result of a skull fracture:

> [E]ach defendant's statement that the other defendant gave proper care to the child and that the child exhibited no alarming symptoms of injury until the morning of his death raised the inference that both were directly and intentionally involved in abusing the child. Such statements can be understood as circumstantial evidence of their joint intentional abuse and the coverup of their actions in the face of the overwhelming medical evidence of extended periods of trauma and pain endured by the child.

In the present case, Susie testified Defendant was with Ashtyn in their bedroom all of the time, and Defendant rarely left that room. Susie and Kalib saw Kenneth feed and change Ashtyn's diapers but nothing more. Defendant took care of Ashtyn most of the time. Detective Howard stated that Defendant said Kenneth was the primary caretaker, and Kenneth said Defendant was. Nevertheless, Defendant also said she bathed Ashtyn and changed his clothes.

Dr. Tape opined Ashtyn's injuries occurred three to five days before his death on January 2, 2017. Kenneth left home sometime Friday, December 30, 2016, and did not return home until Saturday, December 31, 2016, at noon. Defendant and Kenneth argued about him being out all night, and he had a seizure around 5:30 p.m. Kenneth was transported to the hospital and returned home at 11:00 p.m. Testimony did not indicate Kenneth left home again until he was

34

transported by police for questioning on January 2, 2017. The only indication Defendant left home between Friday, December 30, 2016, and January 2, 2017, other than for questioning by police, was Detective Howard's testimony that Defendant said she went to the store "earlier that day," and Susie watched Ashtyn. Susie did not testify she watched Ashtyn while Defendant went to the store.

Susie's testimony indicated Ashtyn was crying on Friday, December 31, 2016, and she quieted him after Defendant asked her to watch him. Approximately ten minutes later, Defendant retrieved the baby. Karen held Ashtyn on Sunday, January 1, 2017, and felt something was wrong with him.

The State relied heavily on Defendant's statement to police. Defendant stated that Kenneth brought Ashtyn to her after feeding him, and Kenneth went to take a shower. When Kenneth came back, Kenneth said Ashtyn was gasping for air.

The only testimony about bruises on Ashtyn prior to paramedics arriving was from Detective Howard. Defendant told Detective Howard she noticed bruises on Ashtyn's face when Kenneth woke her and told her Ashtyn was not responding, which was after Kenneth took a shower. When asked what Ashtyn was wearing, Defendant stated he had a bruise under his chin that looked like it was going away. She did not know how he got that bruise. She also told Detective Howard that Ashtyn had a bruise around one eye, and Kenneth reported he saw bruising around the other eye.

The nature of Ashtyn's injuries was sufficient to establish specific intent to inflict great bodily harm, if not to kill, by the person who inflicted them. It was reasonable for the jury to conclude Defendant was with Ashtyn when the injuries that caused his death were inflicted, as testimony indicated Defendant rarely left

her room. Although it is possible Kenneth was present when Ashtyn's injuries were inflicted, he was not home for some time Friday and a large portion of Saturday. Furthermore, Defendant's statements to Detective Howard were contradictory, her response about bruising to Ashtyn's chin when asked about his clothing was peculiar, and Brown's testimony that Defendant rolled her eyes when he asked her what happened to Ashtyn was damning. The jury's verdict clearly indicates it did not find Defendant's hypothesis that someone else in the home inflicted Ashtyn's injuries credible.

Based on the ruling in *Julien*, 139 So.2d 1152, and the statement of the second circuit in *Tensley*, 955 So.2d 227, we conclude it is sufficiently reasonable that a rational juror could have found Defendant guilty of the crime of second degree murder as charged beyond a reasonable doubt, and thus, the compromise verdict of manslaughter is affirmed.

### ASSIGNMENT OF ERROR NUMBER TWO

In her second assignment of error, Defendant contends that the sentence imposed is constitutionally excessive.

Defense counsel made a contemporaneous objection to the sentence imposed at the conclusion of the sentencing hearing. However, he did not set forth any grounds for the objection or ask for reconsideration of the sentence. Furthermore, no written motion for reconsideration of the sentence was filed. In *State v. Barling*, 00-1241, 00-1591, pp. 10-11 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1041-42, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, this court discussed review of sentences in such cases as follows:

> The failure to timely file a written motion to reconsider sentence or to orally urge any specific ground for reconsideration at sentencing precludes a defendant from objecting to the sentence

36

imposed. *State v. Moore*, 98-1423 (La.App. 3 Cir. 3/3/99); 734 So.2d 706. *See also State v. King*, 95-344 (La.App. 3 Cir. 10/4/95); 663 So.2d 307, *writ denied*, 95-2664 (La.3/15/96); 669 So.2d 433. La.Code Crim.P. art. 881.1 (emphasis added) serves as the basis for this restriction and provides, in pertinent part:

> A. (1) Within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> (2) The motion shall be oral at the time of sentencing or in writing thereafter *and shall set forth the specific grounds on which the motion is based*.
>
> . . . .
>
> D. Failure to make or file a motion to reconsider sentence *or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.*

In cases where courts have held that an oral objection alone is sufficient to preserve the issue for review, the oral objection contained the basis for the motion, such as excessiveness of sentence. *See State v. Caldwell*, 620 So.2d 859 (La.1993); *State v. Trahan*, 98-1442 (La.App. 4 Cir. 12/1/99); 752 So.2d 921.

This court has previously reviewed claims of excessiveness where no motion to reconsider sentence was filed. *See State v. Davis*, 06-922 (La.App. 3 Cir. 12/29/06), 947 So.2d 201; *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied*, 09-606 (La. 12/18/09), 23 So.3d 936; *State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011).

In *State v. Rexrode*, 17-457, pp. 3-4 (La.App. 3 Cir. 11/15/17), 232 So.3d 1251, 1253-54, this court discussed the standard of review for excessive sentence claims:

Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43 (citing *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124, *writ denied*, 00-165 (La. 6/30/00), 765 So.2d 1067).

. . . .

"[Louisiana] Const. art I, § 20, guarantees that, '[n]o law shall subject any person to cruel or unusual punishment.' " *Barling*, 779 So.2d at 1042-43. "To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering." *Id.* at 1042 (citing *State v. Campbell*, 404 So.2d 1205 (La.1981)).

The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *Barling*, 779 So.2d at 1042-43 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996)). In reviewing the defendant's sentence, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. "[T]he appellate court must be mindful that the trial court is in the best position to consider the aggravating and mitigating circumstances of each case. . . ." *State v. Williams*, 02-707 (La.App. 3 Cir. 3/5/03), 839 So.2d 1095, 1100 (citing *Cook*, 674 So.2d 957).

Defendant was convicted of manslaughter. The victim killed was under the age of ten years. Thus, Defendant was subject to a term of imprisonment at hard labor, without benefit of probation or suspension of sentence, for not less than ten nor more than forty years. La.R.S. 14:31(B). Defendant was sentenced to serve seventeen years at hard labor.

At the sentencing hearing, the trial court noted that it had considered the presentence investigation report and the psychological evaluation of Defendant. In

the presentence investigation report, Defendant professed she did not commit the offense. In her psychological evaluation, Dr. Simoneaux opined that Defendant did "not appear to have any great potential for future danger."

The court noted the following aggravating factors: 1) the offender's conduct manifested deliberate cruelty to the victim; 2) the offender should have known the victim was particularly vulnerable or incapable of resistance due to extreme youth; 3) the offender used her position as a mother to facilitate the commission of the offense; and 4) the offense resulted in the death of the victim. The court then set forth the following mitigating factors: 1) Defendant had no history of prior delinquency or criminal activity; 2) she was sixteen years old at the time of the offense; and 3) she was living under circumstances where she was not given any significant support by the adults in her life. The court then stated the following:

> The evidence at trial clearly established the fact that an innocent baby died from abuse - severe abuse which took place over a period of several days. Baby Ashtyn lived for 27 days in a home with one adult - his paternal great grandmother and 3 minor children - his father, his mother, and his uncle. No one will ever know exactly what happened in that home and why no one cared enough to call the authorities prior to the night Ashtyn died. But after hearing all the evidence at trial, the Jury found this defendant, Donasty Cohen, Guilty of Manslaughter. This was a good verdict supported by the evidence. Manslaughter is a homicide that would be first or second degree murder but is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of self-control or cool reflection. When the victim of the manslaughter is under the age of 10 years old, as in this case, the law provides the defendant must serve a minimum of 10 years and a maximum possible sentence of 40 years in prison. Many factors go into determining what sentence may be appropriate in any given case. Four factors should always be considered: First, Rehabilitation. Can this defendant, Donasty Cohen, be rehabilitated? By law, the maximum sentence is 40 years, so she will not spend the rest of her life in jail. What sentence provides for the best chance of success upon release? Ms. Cohen was 16 years old when this crime was committed. While incarcerated, she's already obtained her GED and indicated in her Victim Statement and her Pre-Trial Investigation, that she wanted to further her education and ultimately give back to her community. There is a strong possibility

that Ms. Cohen can rehabilitate herself and live a productive life upon release. Thus, it's important this Sentence does not have counterproductive effects here. Secondly, is society. What Sentence today, would serve as a general deterrence for the community as a whole? Ms. Cohen was convicted of Manslaughter, which is a crime of passion. Deterrence to society therefore is not a strong consideration. The real societal issue herein is the epidemic of teen pregnancy and the Sentence today is unlikely to have any impact on that problem. The third consideration is the victim. Of course we must consider the victim in this case. Baby Ashtyn was only 27 days old and completely vulnerable when he died. He surely must have suffered greatly in his short life and so justice demands that the defendant be sentenced accordingly. The final factor is punishment. What Sentence would specifically deter Ms. Cohen from future criminal conduct? And, considering this factor, it's significant that Ms. Cohen has no criminal history and no history of violence at all. She was a minor child herself at the time of the crime, was immature, and terribly unequipped to handle this very adult situation. According to the testimony at trial, she was offered little or no help from the adults around her.

This crime involved the senseless death of a twenty-seven day old boy. As noted by the trial court, Defendant was sixteen years old at the time of the offense and had no criminal record. Further, Dr. Simoneaux opined she was unlikely to be a danger in the future.

In *State v. Jones*, 99-2207 (La. 1/29/01), 778 So.2d 1131, a nineteen-year old first offender was charged with first degree murder following the death of his twenty-two month old daughter.[5] Although the defendant did not inflict the injuries that caused the child's death, his decision not to seek medical attention for the victim contributed to the neurological crisis which took the child's life. The defendant ultimately entered a plea to manslaughter and was sentenced to twenty years imprisonment. The supreme court affirmed that sentence, noting second degree cruelty to juveniles was not a crime when the events at issue occurred, and

---

[5]The defendant's age was not referenced by the supreme court but was set out in this court's opinion in *State v. Jones*, 99-122 (La.App. 3 Cir. 6/23/99), 742 So.2d 597, which was reversed by the supreme court in *Jones*, 778 So.2d 1131.

the penalty for the newly enacted offense of second degree cruelty to juveniles was the same as that provided for manslaughter.

In *State v. Hicks*, 42,427 (La.App. 2 Cir. 10/24/07), 968 So.2d 307, the defendant was charged with and pled guilty to manslaughter arising out of the shaking death of his seven week old daughter. As part of the plea, the state waived the minimum mandatory sentence of ten years. However, the defendant, a first offender, was sentenced to forty years at hard labor. The second circuit affirmed his sentence.

In *State v. Givens*, 45,246 (La.App. 2 Cir. 6/9/10), 41 So.3d 589, the defendant was charged with second degree murder for the death of his girlfriend's twenty-two-month-old son. He was, however, found guilty of the responsive verdict of manslaughter and sentenced to thirty-seven years at hard labor. In considering his excessive sentence claim, it was noted the defendant had a "misdemeanor prior criminal history." *Id.* at 604. The second circuit further stated:

> [A] 22–month–old baby, died after being brutally punched and squeezed. Evidence indicates that the child experienced pain and suffering in the time between the infliction of the wounds and his untimely and senseless death. These facts qualify as nothing short of horrific and disturbing and would have supported a conviction on the charged offense of second degree murder. Thus, the near maximum sentence imposed for the manslaughter conviction cannot be said to be grossly disproportionate to the facts of the offense or shocking to the sense of justice.

*Id.*

In light of the nature of the offense, the fact that the jury's verdict did not adequately describe Defendant's conduct, and the above-cited cases, the trial court did not abuse its discretion when imposing a sentence of seventeen years.

## ASSIGNMENT OF ERROR NUMBER THREE

In her third assignment of error, Defendant contends that the trial court erred in denying her challenges for cause. She complains about prospective jurors Patricia Alonzo and Jamarcus Chase.

Louisiana Constitution article I, section 17 guarantees a defendant the "right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." *State v. Juniors*, 03-2425, p. 7 (La. 6/29/05), 915 So.2d 291, 304. The number of peremptory challenges granted to a defendant in a trial of an offense punishable necessarily by imprisonment at hard labor, such as the one currently before this court, is fixed by law at twelve. *See* La. Const. art. I, § 17(A); La. C.Cr.P. art. 799.2. When a defendant uses all twelve of his peremptory challenges, an erroneous ruling by a trial court on a challenge for cause that results in depriving the defendant of a peremptory challenge constitutes a substantial violation of the defendant's constitutional and statutory rights, requiring reversal of the conviction and sentence. *Juniors*, 03-2425 at 7-8, 915 So.2d at 304; *see* La. C.Cr.P. art. 921 ("A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."). Therefore, prejudice is presumed when a challenge for cause has been erroneously denied by a trial court and the defendant exhausts all peremptory challenges statutorily afforded to the defendant. *Juniors*, 03-2425 at 8, 915 So.2d at 305 (citing *State v. Robertson*, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1280, and *State v. Ross*, 623 So.2d 643, 644 (La. 1993)). In summary, where all peremptory challenges have been used, as in this case, a defendant need only demonstrate the erroneous denial of a challenge for cause to establish reversible error warranting reversal of a conviction and sentence. *See Juniors*, 03-2425 at 8, 915 So.2d at 305.

A defendant may challenge a juror for cause if "[t]he juror is not impartial, whatever the cause of his partiality." La. C.Cr.P. art. 797(2). Additionally, La. C.Cr.P. art. 797(3) provides a defendant may challenge a juror for cause on the ground that "[t]he relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict." A "juror [who] will not accept the law as given to him by the court" may also be challenged for cause by the defendant. *See* La. C.Cr.P. art. 797(4).

*Voir dire* examination of prospective jurors is designed to discover bases for challenges for cause and to secure information for

42

an intelligent exercise of peremptory challenges. *State v. Drew*, 360 So.2d 500, 513 (La. 1978). The questions propounded are designed to determine any potential adverse influence on the prospective juror's ability to render an impartial verdict. <u>See</u> *id.* A prospective juror's responses during *voir dire* cannot be considered in isolation. <u>See</u> *State v. Frost*, 97-1771, p. 8 (La. 12/1/98), 727 So.2d 417, 426.

A trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling is subject to reversal only when a review of the entire *voir dire* reveals the judge abused his discretion. *Robertson*, 630 So.2d at 1281. The trial judge's refusal to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. *Id.*

*State v. Dotson*, 16-473, pp. 3-5 (La. 10/18/17), 234 So.3d 34, 38-39 (footnotes omitted).

*JUROR ALONZO*

During voir dire, the trial court asked if there was anyone who thought they morally or emotionally could not deal with the case. Patricia Alonzo replied: "Because it's dealing with -this is dealing with a child so from past experience, I don't think I probably can't be fair." The judge responded: "Okay, just by the very nature of the charges?" Alonzo answered affirmatively. The resulting exchange took place:

BY THE COURT:

> . . . So, does Ms. Alonzo, is there something specific you want to talk to me about or are you just saying I don't - this is emotional for everybody and it's going to be emotional for me.

BY MS. ALONZO, J1:

> Psychologically - I don't know. I just want to be fair. I don't want to, by things that happened in the past, I don't want to bring something that happened in the past . . .

BY THE COURT:

> Right and that's why I'm asking if there's something specific to you that you want to talk to me about.

BY MS. ALONZO, J1:

> No, (inaudible).

The following exchange subsequently occurred:

BY MS. CARTER [THE STATE]:

> Okay and without going into a lot, you know but all your concerns and I believe you said, maybe some psychological things that's going on, could you still be fair and impartial? And, if you can't, that's okay. Just want honesty.

BY MS. ALONZO, J1:

> I would try to be fair, but from past experience, I probably would - I'm afraid I might go - I wouldn't be fair emotionally and psychologically . . .

The State asked if prospective jurors could "still be fair and impartial" if they knew Defendant faced life with benefit of parole, and Alonzo replied, "Yes." Alonzo stated her son had been a Texas State Trooper for four years, and she could still be fair and impartial. When asked by defense counsel what made it so difficult for her, Alonzo stated, "I have 9 sisters and we all went through so many parental abuse[s] so I, I would - sometimes I find myself prejudging because of the . . ." Defense counsel further asked Alonzo, "are you going to transfer what happened to you to my client and say well my parents - what is it, what phenomenon is working to make you to have such issues with it?" Alonzo responded, "Because of pre-judging . . ."

Later, the following exchange took place:

44

BY THE COURT:

And. Ms. Alonzo, and I keep going back to you and I'm just going to have to keep going back until I'm comfortable with where everybody stands. So, this is emotional. We all know this is emotional. Okay, and it's normal to have emotions. In fact, they want people with emotions because they want normal people, alright, so, the question is, there's no doubt we're all going to be sympathetic to the child, right? The question is, can you still apply the standards of the law? Can you still listen to the evidence and I'm going to tell you, you know, here's the standards for Second Degree Murder. You must find, uh, I'll just tell you right now. . . . Okay? So, I'll give you, at the end, here's all the various things you can pick, here's all the elements of those things. All I want you to do is have the story. Okay? Have the story. How did this happen? Okay. We're all going to be sad, but how did it happen? That's all we want to know. So, can you just put aside the - this is so emotional and still find out how does this happen? Can you do that Ms. Alonzo?

BY MS. ALONZO, J1:

Yes.

BY THE COURT:

Okay so you could be fair .

BY MS. ALONZO, J1:

Yes.

The trial court later asked: "Does anybody feel like they simply cannot be fair in this case? If that's true, raise your hand." The trial court then spoke to prospective juror Briggs.

Defense counsel challenged Alonzo for cause on the basis that she said she could not be fair, was the victim of abusive parents, and her demeanor. He did not

45

feel Alonzo had been rehabilitated. The court noted it went back to rehabilitate her because it felt her comments were conflicting, and she specifically said she could be fair. The court further stated:

> I think initially when people found out that it involved an infant, that all of them had some reaction, but I think once, once we explained that the emotion can be part of the judgment, that they, she understood that and I gave her ample opportunity to say, No, I really just can't be fair. So, I'm not going to strike her.

Defense counsel objected to the ruling and used a peremptory strike to excuse Alonzo.

Defendant argues the trial court did not sufficiently rehabilitate Alonzo. Defendant avers Alonzo said she could be fair but never said she could be impartial. In light of Alonzo's responses prior to her statement that she could be fair, Defendant alleges it was error for the trial court to deny her challenge for cause. She cites *State v. Tyler*, 619 So.2d 807 (La.App. 1 Cir.), *writ denied*, 624 So.2d 1225 (La.1993), in support of her argument.

In *Tyler*, the defendant was charged with aggravated rape of a child. During voir dire, the defendant challenged prospective juror Adams for cause on the ground Adams had asserted she would be inclined to favor the child in the case. The State argued Adams had said only that it would be personally upsetting or perhaps very hard for her to listen to the evidence but that she would be able to render a fair and impartial judgment based solely on the evidence. Adams sat silent during repeated questioning by the State and defense concerning whether or not any of the jurors would have any difficulty hearing that type of case. Adams later interrupted and volunteered, "'I have very sensitive feelings toward children and animals and I'm not sure I could do this.'" *Id.* at 813. She next explained that she would be able to listen to the evidence but expressed concern that her

"'feelings are so sensitive when it comes to children.'" *Id.* When defense counsel

asked Adams whether she would be able to fairly evaluate the testimony or

whether she would place more weight on the child's testimony, Adams stated, "'It

would be hard for me to say at this point.'" *Id.* The court then explained to Adams

that everyone had certain prejudices and that the court was interested in whether or

not she could listen to the evidence and render a verdict based upon the evidence

presented. Adams responded, "'I think I could do that, but I would probably feel

more for the child, and . . . my decision might be . . . [m]ore for the child on, based

on that.'" *Id.* Adams was not questioned further concerning this response.

The first circuit addressed the issue:

> Under these circumstances, we find the trial court erred by denying defendant's challenge for cause of Adams. Although Adams stated that she thought she could render a verdict based upon the evidence, she then said that her feelings were slanted toward children and implied that, in the event of a conflict between the testimony of defendant and a child, she would be more inclined to believe the child. Although bias of this kind can be overcome by rehabilitation, neither the trial court nor the State rehabilitated Adams. In light of her statements and in the absence of rehabilitation, it was not reasonable to conclude that Adams was capable of serving as an impartial juror. *See*, *State v. White*, 574 So.2d 561, 563 (La.App. 3d Cir.1991).

*Id.* at 813-14. The first circuit went on to state that the erroneous denial of a

challenge for cause was not automatically reversible error, and to defeat the

application of the harmless error rule, the defendant must establish that he was

prejudiced by the trial court's ruling.

In the present case, the State suggests the erroneous denial of a challenge for

cause is not automatically reversible error, and *Tyler* is distinguishable from the

case at bar because there was no attempt to rehabilitate Adams. We note that in

footnote three of *Dotson*, 234 So.3d at 38, n.3, the supreme court stated that if all

available peremptory challenges have not been used, a defendant must show some

prejudice to overcome La.Code Crim.P. art. 921's mandate that a ruling not be reversed because of an error that does not affect substantial rights of the accused. All twelve of Defendant's peremptory challenges were used in the case at bar. Thus, harmless error is inapplicable.

In *Dotson*, 234 So.3d at 41-42, the supreme court stated:

> "[T]he fact that a juror may have painful memories associated with the subject of a criminal trial is not listed as a basis for a challenge for cause under La.C.Cr.P. art. 797." *State v. Magee*, 13-1018, p. 12 (La.App. 5 Cir. 9/24/14), 150 So.3d 446, 454, *writ denied*, 14-2209 (La. 10/2/15), 178 So.3d 581. That a prospective juror personally has been the victim of a crime will not necessarily preclude that prospective juror from serving on a jury. *State v. Dorsey*, 10-0216, p. 3 (La. 9/7/11), 74 So.3d 603, 631. A prospective juror's relationship to a person who was the victim of a crime likewise does not disqualify a prospective juror from serving. *See id.*; *State v. Nix*, 327 So.2d 301, 326 (La. 1975) (a prospective juror's relationship to a murder victim—his brother-in-law—was insufficient to establish cause for excusing the venireman).
>
> The law does not require that a jury be composed of individuals who have not personally been a crime victim or who do not have close friends or relatives who have been crime victims. It requires that jurors be fair and unbiased. *Juniors*, 03-2425 at 11, 915 So.2d at 306. Therefore, the prospective juror's past experience as, or relationship to, a victim of a crime similar to that for which the defendant is being tried must be examined in conjunction with other evidence in the record of the *voir dire* proceeding that bears on the prospective juror's ability to be fair and impartial and to apply the law as instructed by the trial court. *See Dorsey*, 10-0216 at 38-39, 74 So.3d at 631; *Nix*, 327 So.2d at 326.

In *State v. Burse*, 14-564 (La.App. 5 Cir. 3/25/15), 169 So.3d 649, *writ denied*, 15-804 (La. 3/4/16), 188 So.3d 1056, the defendant was charged with aggravated rape and sexual battery. Both offenses were committed against a victim under the age of thirteen. During voir dire, the trial court asked the prospective jurors whether they or a close friend or relative had been the victim of a crime. Prospective juror J.R. stated she was raped when she was eleven. J.R. indicated she would be able to set aside her personal experience and give the

defendant a fair trial. Defense counsel challenged J.R. for cause, arguing she could not be fair and impartial. J.R. was further questioned at the bench, wherein she stated:

> [T]he incident was not "out of her mind," but that she had forgiven the person who raped her. She stated that, at sixty-two years old, although she thinks about the rape when she hears about similar instances of sexual abuse, she does not "dwell on it." After making those comments, the following exchange took place:
>
>> DEFENSE COUNSEL: And when you hear similar things happening it comes to your mind?
>>
>> J.R.: Yes.
>>
>> DEFENSE COUNSEL: And you have memories?
>>
>> J.R.: Yes, and it bothers me.
>>
>> MR. MILLER: And I noticed when you brought it up you, emotions welled up with you, you maybe even cried a little bit.
>>
>> J.R.: Yes, sir.
>>
>> MR. MILLER: Those emotions do you think you could put those aside hearing more than once about something—
>>
>> J.R.: You know, to be honest with you I can try, I don't know how it would affect me further on, I don't know, I can't say.

*Id.* at 655. Defense counsel re-urged his challenge for cause, arguing that even after fifty-one years, J.R.'s emotions were profound and would get in the way of her being fair and impartial. The state noted J.R. said she could be fair. The trial court ultimately denied the challenge for cause.

Another prospective juror in *Burse*, D.F., was a special education teacher at an elementary school. She agreed the fact that she worked with children did not mean that she was "'predisposed against any defendant charged with a crime in

49

which it is alleged a child was abused.'" *Id.* at 656. D.F. stated that she could be fair, impartial, and could listen to both sides. D.F. also disclosed that when she was eight years old, she and her sister were abducted by a man on the way home from school. She further explained that she was sexually molested, but she and her sister got away. The trial court noted that the memory of that experience visibly upset D.F. and asked her whether she would be able to sit through a trial and listen to evidence of alleged sexual abuse of a small child. D.F. stated she could but indicated, "'I don't know how to say that my experience won't influence me because I don't know how to separate that.'" *Id.* She went on to state that she would listen to the evidence and would be fair because a man's life was at risk. The trial court acknowledged that each juror entered the courtroom with their own personal experiences and asked D.F. whether she understood the distinction between the defendant and the man who sexually abused her when she was a child. D.F. indicated that she understood and further stated she was smart enough to know that the defendant was another man. Defense counsel challenged D.F. for cause on the basis that she was a victim and became very emotional. In denying the challenge for cause, the trial court found that, in spite of being emotional, D.F. clearly stated that she would follow the law as a juror.

In addressing Burse's claim that his challenges for cause were improperly denied, the fifth circuit stated:

> Louisiana appellate courts have repeatedly upheld the denial of challenges for cause of prospective jurors who have been the victims of crimes similar to the one of which the defendant stands charged, where the juror states that he or she would be fair, impartial, and not prejudiced against the defendants. *See State v. Thomas*, 13-475 (La.App. 3 Cir. 11/06/13), 124 So.3d 633; *State v. Stovall*, 439 So.2d 618 (La.App. 1 Cir.1983); *State v. Williams*, 44,418 (La.App. 2 Cir. 6/24/09), 15 So.3d 348, *writ denied*, 09-1746 (La.3/26/10), 29 So.3d 1250.

This Court addressed the issue in a similar case, *State v. Mazique*, 09-845 (La.App. 5 Cir. 04/27/10), 40 So.3d 224, *writ denied*, 10-1198 (La.12/17/10), 51 So.3d 19. In *Mazique*, this Court affirmed the trial court's denial of the defendant's challenge for cause with regard to a potential juror whose child had been the victim of a crime of sexual violence similar to the one for which the defendant was charged. *Id.* The defendant in *Mazique* was charged with aggravated incest and pornography involving juveniles, and therefore claimed that the prospective juror could not be impartial because her daughter had been sexually molested as a child. *Id.* at 239. During *voir dire*, the prospective juror stated she did not know whether her experience would affect her ability to sit on the jury but indicated that she had not formed an opinion as to the defendant's guilt or innocence. *Id.* When the prosecutor asked the prospective juror whether she could be fair and impartial to both sides she responded "I think I can . . . It's so hard." *Id.* However, later, when asked the same question she stated "I can. It will be hard, but I can." *Id.* Upon further questioning by defense counsel, the prospective juror indicated that the incident in her life was very traumatic and she was emotional every time she thought about it. *Id.* She also agreed that given the nature of the case, the incident would weigh heavily on her mind. *Id.* at 240.

The defendant in *Mazique* challenged the prospective juror for cause on the basis that she was "visibly shaken and very emotional and upset by the whole thing." The trial court denied the challenge, finding she was rehabilitated and noting her statement that she could be fair in this case. In affirming the judgment of the trial court, this Court found that the prospective juror's responses, "as a whole, did not reveal facts from which bias, prejudice, or inability to render a judgment according to law could be reasonably implied." Accordingly, this Court held the trial court did not abuse its discretion by denying the defendant's challenge for cause.

Here, it appears that J.R. [] and D.F.'s *voir dire* testimony as a whole clearly shows their willingness and ability to be fair and impartial jurors and to decide the case according to the law and evidence. All [] jurors clearly communicated their willingness and ability to serve as fair and impartial jurors and to render a judgment according to the applicable law. Therefore, here, as in *Mazique*, the fact that prospective jurors J.R. [] and D.F. had prior experiences as victims of similar crimes to the ones Mr. Burse was charged with is not determinative of their ability to serve as fair and impartial jurors. Thus, we find that the trial court did not err in denying Mr. Burse's challenges for cause with regard to jurors J.R. [] and D.F.

*Id.* at 656-57.

Based on the rulings in *Burse*, 169 So.3d 649, and *State v. Mazique*, 09-845 (La.App. 5 Cir. 4/27/10), 40 So.3d 224, *writ denied*, 10-1198 (La. 12/17/10), 51 So.3d 19, which was cited in *Burse*, we find that the trial court did not abuse its discretion when denying the challenge for cause as to prospective juror Alonzo, as Alonzo ultimately indicated she could put aside her emotions and be fair.

*JUROR CHASE*

Jamarcus Chase stated he was a correctional officer at Raymond Laborde Correctional Center. When the jury panel was asked if anyone knew Defendant or her attorney, the following exchange occurred:

BY MR. CHASE, J8:

>    I believe I know her. Um, I think my sister dated one of her brothers if I'm not mistaken.

BY THE COURT:

>    Okay. Your sister dated one of her brothers?

BY MR. CHASE, J8:

>    If her brother's name is Troy Price, she definitely dated him.

BY THE COURT:

>    Okay, um, do you - other than knowing that she may have that name, do you know anything about her or about this case?

BY MR. CHASE, J8:

>    I have heard about this case.

BY THE COURT:

>    Okay, I'm going to talk to you about that probably in private.

The State asked if prospective jurors could "still be fair and impartial," if they knew Defendant faced life with benefit of parole, and Chase replied, "Yes, ma'am."

Defense counsel challenged Chase for cause, stating: "I mean he heard, my client and her husband killed the baby. I mean that's - I don't know how you get around that." The court then stated the following regarding an "off the record" conversation:

BY THE COURT:

> . . . because we've talked to him outside the presence of the microphones, off the record, and uh, Mr. Chase, when talked to Mr. Smith and Ms. Carter and myself, outside the presence of the jury, because he had indicated that he heard something about the case, he stated and so you're both hearing . . . he stated that he, his younger sister had gone out with the defendant's brother at some point and . . . she had told him at some point, he doesn't remember how it came up - oh I heard she and her boyfriend killed the baby. And so when questioned about that, he said, I don't have any preconceived ideas about it. I don't know any specifics about how it happened. I just know that she just said that and I saw something on KALB about it when I knew I had jury duty. Um, he said he could be fair, he's a correctional officer, um, I don't think - he said it would not - I mean if anybody, I would think the bias would be against the State because he's somewhat personally connected to the defendant. But, he also stated (interrupted)

BY MR. SMITH [DEFENSE COUNSEL]:

> I don't care who the bias is for. It's a bias. That's - a relative of his . . .

BY THE COURT:

> I mean he said she was young, his little sister's young and that she just went out with

this guy a couple of times. She didn't even know the - whether or not [s]he was her sister until given more information.

BY MS. CARTER:

Plus he indicated he's never met Ms. Cohen . . .

BY THE COURT:

He'd never met her. He didn't know one thing about the case.

MS. CARTER:

. . . had no interaction with her. Correct.

BY THE COURT:

It's just somebody made that statement.

Defense counsel re-urged his challenge for cause, which was denied by the trial court. Defense counsel objected to the trial court's ruling and used a peremptory strike to excuse Chase.

Defendant argues that although it was Chase's sister that had a relationship with her brother, the challenge for cause should have been granted especially given what Chase heard from his sister. Defendant cites the following from *State v. Brown*, 496 So.2d 261, 265 (La.1986), in support of her argument: "When a prospective juror admits to having a personal relationship with the victim or the victim's family, it is unrealistic to believe the juror could be impartial in his or her deliberations concerning the defendant's guilt or innocence."

The State argues *Brown* is distinguishable in that the son of prospective juror Nash had dated the seventeen-year old victim in high school, and Nash knew the victim's parents. The supreme court concluded that, even though Nash testified she could give the defendant a fair trial, it was unrealistic to conclude her

54

relationship with the victim and the victim's family would not affect her deliberations in reaching a verdict.

In *Brown*, prospective juror Cockrell indicated that although he did not know the victim, his son played on the same little league team with the victim's younger brother, he had visited with the victim's parents in the bleachers while watching games, and the victim's parents and two of their children had attended a party that Cockrell hosted for the baseball team. Cockrell was asked whether his vote to let the defendant live would cause problems when he met the victim's parents at the ball park, and he stated it "[p]ossibly would." *Id.* at 265. The defendant's request to excuse Cockrell for cause was denied. The supreme court found the judge erred in denying the challenge for cause.

In *State v. Wiley*, 614 So.2d 862 (La.App. 2 Cir. 1993), the state challenged for cause prospective jurors Henderson and Wimberly because each stated she had a relationship with the defendant and/or his family which would influence her decision if she served as a juror. The trial court granted the challenges, and the defendant objected because both Henderson and Wimberly stated they would try to set aside their feelings if they were selected and forced to vote. In addressing the issue, the second circuit stated:

> In *State v. Drumgoole*, 517 So.2d 909 (La.App. 3d Cir.1987), a challenge for cause based upon a relationship with the accused's family was found to have been properly granted. Although the potential juror stated that she would vote if she had to, she also stated it would be hard for her to be impartial. Likewise, although the instant potential jurors stated that they would attempt to set aside their bias if forced to, both stated that it would be hard to do so because they felt influenced by their relationship with the defendant. Under these circumstances, the trial court did not err in excusing Henderson and Wimberly for cause.

*Id.* at 866.

In *Mazique*, 40 So.3d 224, Ebeyer was the defendant's co-worker and a prospective juror at his trial. The defendant challenged Ebeyer for cause, arguing Ebeyer's status as his co-worker allowed Ebeyer to obtain potentially inaccurate information regarding the case and would have been improperly influenced in arriving at a verdict. During voir dire, Ebeyer stated he worked with the defendant for four or five years but did not consider himself a friend of the defendant. Ebeyer had not discussed the case with the defendant but had heard about it from other people at work. He heard that pornographic material involving Mazique's relative was found on his phone and in his locker, and Ebeyer was told Mazique was escorted from work. Based on the information he had heard, Ebeyer had not formed an opinion as to Mazique's guilt or innocence. The fifth circuit addressed the issue, stating:

> Ebeyer, Mazique's co-worker, learned some limited information regarding this case at his place of employment. Nevertheless, Ebeyer demonstrated a willingness and ability to decide the case impartially according to the law and evidence, and his responses as a whole did not reveal facts from which bias, prejudice, or inability to render a judgment according to law could be reasonably implied.

*Id.* at 239. Thus, the fifth circuit found the trial judge did not abuse his discretion by denying the challenge for cause as to prospective juror Ebeyer.

In *State v. Gray*, 533 So.2d 1242 (La.App. 4 Cir. 1988), *writ denied*, 546 So.2d 1209 (La.1989), the defendant was charged with aggravated rape of his three children. He complained the trial court erred in denying the challenge for cause of the principal of his children's school. The principal knew the family and was aware of an investigation into possible physical abuse of the children but had no knowledge of the results of the investigation nor was he aware of possible sexual

56

abuse. The fourth circuit found the prospective juror's responses clearly showed his willingness and ability to be an unbiased, impartial juror.

In *Brown*, 496 So.2d 261, and *Wiley*, 614 So.2d 862, the prospective jurors indicated that a relationship with the defendant or the victim would affect their verdicts, whereas Chase indicated that he did not know Defendant and stated he could be fair and impartial. The relationship between Defendant and Chase is also distinguishable from *Mazique*, 40 So.3d 224, and *Gray*, 533 So.2d 1242, in that Chase did not know Defendant. Furthermore, Chase informed the trial court that he had no preconceived ideas about the case and did not know any specifics about how the offense occurred. The trial court then stated Chase said he could be fair. Based on the voir dire as a whole, we find that the trial court did not abuse its discretion in denying Defendant's challenge for cause as to prospective juror Chase.

## DECREE

Defendant's conviction and sentence is affirmed. However, Defendant's sentence is amended to delete the denial of parole eligibility, and the trial court is instructed to make an entry in the minutes reflecting this change.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED WITH INSTRUCTIONS.**

57